2022 IL App (2d) 191099-U
No. 2-19-1099
Order filed July 28, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF WILLIAM GEORGE CONOPEOTIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Petitioner-Appellee/Cross-Appellant, | ) ) | |
| and | ) ) | No.   17-D-289 |
| LYDIA ANN CONOPEOTIS, | ) ) | |
| Respondent-Appellant/Cross-Appellee | ) ) | Honorable Janelle K. Christensen, |
| (John N. Rodis, Third-Party Respondent). | ) | Judge, Presiding. |

_____

JUSTICE HUDSON delivered the judgment of the court.
Justices Schostok and Birkett concurred in the judgment.

## ORDER

¶ 1    *Held*:  (1) Trial court's credibility determination with respect to petitioner was not against the manifest weight of the evidence; (2) based on the rule of acquiescence or invited error, respondent was estopped from complaining about the trial court's reliance on computer software program calculations in setting petitioner's child-support and maintenance obligations; (3) trial court properly determined petitioner's net income for purposes of establishing his support obligations based on tax law in effect at the time the calculation was made; (4) trial court did not abuse its discretion in deciding not to deviate upwards from the statutory support guidelines; (5) it was not improper for trial court to average petitioner's gross income over period of three years as the basis for establishing his support obligations; (6) trial court's mathematical errors in determining petitioner's gross income and inclusion of income not belonging to him required remand for recalculation; (7) trial court

imputed the proper level of income to respondent; (8) trial court erred in allocating 100% of the cost of maintaining medical insurance for the parties' children to petitioner; (9) trial court did not err in declining to award either party contribution to his or her attorney fees from the other party; and (10) cause would be remanded to trial court to recalculate petitioner's average gross income for 2014 through 2016, recalculate petitioner's net income and support obligations based on the corrected number, and allocate the cost of maintaining medical insurance for the children between the parties in proportion to their respective net incomes.

¶ 2    Respondent, Lydia Ann Conopeotis, appeals from an order of the circuit court of Lake County dissolving her marriage to petitioner, William George Conopeotis. Petitioner has cross-appealed from the same judgment. Respondent argues that the trial court erred in (1) determining maintenance and child support and (2) denying her request for contribution to her attorney fees and costs from petitioner. Petitioner challenges the trial court's finding that he lacked credibility and its calculation of his income for purposes of setting maintenance and child support. Additionally, petitioner argues that the trial court erred by imputing insufficient income to respondent, failing to allocate the cost of maintaining medical insurance for the parties' children in proportion to the parties' respective net incomes, and denying his request for contribution to his legal fees from respondent. For the reasons set forth below, we affirm in part, reverse in part, and remand for further proceedings.

¶ 3                              I.  BACKGROUND

¶ 4    The case at bar involved substantial pretrial litigation, culminating in a contentious trial that lasted 12 days. The record itself contains in excess of 11,000 pages. To place the issues raised in context, we initially provide a summary of the facts leading to this appeal. We provide a more detailed discussion of the facts necessary to resolve the issues presented as those issues are addressed in the course of this disposition.

¶ 5    The parties were married on September 17, 1994. Twin daughters were born to the parties on August 6, 2005. On December 22, 2016, respondent filed in the circuit court of Cook County a

petition for dissolution of marriage and a motion for waiver of venue. On February 17, 2017, petitioner filed a petition for dissolution of marriage in the circuit court of Lake County. On February 23, 2017, petitioner filed a motion to transfer respondent's petition for dissolution from Cook County to a proper venue. After a contested hearing, respondent's motion for waiver of venue was denied, petitioner's motion to transfer to a proper venue was granted, and the case was transferred to Lake County. Thereafter, respondent filed a counterpetition for dissolution of marriage in the circuit court of Lake County. On October 6, 2017, the trial court entered an "Allocation Judgment Allocation of Parenting Responsibilities and Parenting Plan" and appointed a parenting coordinator.

¶ 6    Prior to trial, John Rodis, respondent's father, was added as a third-party respondent in the case relative to his claimed interest in the parties' real estate. Rodis was represented by the same law firm that represented respondent at trial. The trial of the underlying dissolution of marriage action began on January 22, 2019, and continued over 11 additional dates through March 29, 2019. Four witnesses testified at the trial—petitioner, respondent, Mark Argianas (the accountant for petitioner and his business), and Maria Beecroft (the bookkeeper for petitioner's business). The following relevant evidence was presented at trial.

¶ 7    When the trial commenced, petitioner was 59 years of age and respondent was 48 years of age. Both parties were in good health. Petitioner was self-employed as the president of ConopCo Realty & Development, Inc. (ConopCo). Respondent was not employed outside the home.

¶ 8    Petitioner testified that he was educated at the Milwaukee School of Engineering. In December 1999, petitioner founded ConopCo. ConopCo provides project management services for business clients who are developing new office spaces. ConopCo hires and supervises the architects, engineers, and general contractors, and receives a fixed fee based on the square footage

of the project space. ConopCo also has contracts for property management and development consulting services with Sears, Roebuck & Co., and the Prairie Stone Business Park Property Owners Association. The property management services are provided through a separate entity, Pratum Partners, LLC (Pratum). Petitioner testified that, through his ownership interests in entities known as Prairie Stone Partners, LLC, and ConopCo@Prairie Stone, he has an indirect, 10-11% interest in Pratum. At one time, Pratum owned two office buildings. Pratum sold one of the buildings, and petitioner received a one-time return of equity in the form of capital gain and recapture income. The one remaining asset of Pratum is a 30,000 square-foot, fully-leased, single-story office building known as Prairie Stone Commons.

¶ 9     As president of ConopCo, petitioner testified that he is "100% in charge of all the finances *** and budgets and tax returns." Petitioner further testified that he leads the company, supervises all client relationships, manages the finances, hires the company's employees, and runs all company projects. At the time of the trial, ConopCo had five employees: (1) Aris Hantgos (property manager); (2) Ethan Frank (assistant property manager); (3) Liz McCleary (assistant to petitioner); (4) Melissa Fischer (marketing manager), and Beecroft. All of the employees worked full-time except for Beecroft, who worked part-time because of an illness. In 2017 and 2018, Theodora Franck, petitioner's sister, also worked for ConopCo. Petitioner testified regarding the salaries of some of the employees and stated that he pays his employees bonuses every year, "in good years and bad years."

¶ 10    ConopCo is a subchapter S corporation. All gross revenues are deposited into an operating account. Pratum's revenues also flow to ConopCo. Petitioner receives W-2 wages and "distribution" income or loss from ConopCo that is reported on his individual federal and state income tax returns.

¶ 11     Respondent testified that she met petitioner when she was 20 years of age. At the time, respondent was in her third year of a five-year architecture program at the Art Institute of Chicago. Due to an illness, respondent was unable to complete her degree. At the time of the marriage, respondent was running a corporate gift and wedding/event planning company she founded called "Never Before Baskets." The most she made from the business was in 2004, when she earned between $35,000 and $45,000. Although respondent has kept Never Before Baskets incorporated in good standing over the years and had earned "a couple hundred dollars" from the business as recently as three months before her trial testimony, her primary occupation during the marriage was as a homemaker and the principal caretaker of the children.

¶ 12     During the marriage, respondent also helped petitioner with marketing for ConopCo. In this role, respondent designed project announcement cards, the company brochure, and Christmas cards. She also maintained the client email list and mailed marketing materials to clients. Some of the parties' tax returns include a W-2 form issued to respondent by ConopCo. Respondent testified, however, that petitioner never told her that she was an "employee" of ConopCo and he never provided her with a paycheck or access to her "wages."  Respondent voluntarily stopped providing services to ConopCo when the divorce proceedings began. Petitioner then hired Fischer to perform the tasks previously done by respondent.

¶ 13     Prior to trial, petitioner filed a petition to compel respondent to search for employment and maintain a job diary. The court ordered respondent to seek employment and make a minimum of two job inquiries per week. The court also ordered respondent to submit her job diaries on the first day of each month, commencing November 1, 2017. Respondent submitted job-search logs for the months of November 2017, December 2017, January 2018, and February 2018.

¶ 14     Petitioner testified that, based on his extensive experience in project management as well

as hiring and managing ConopCo's employees, and based on petitioner's skills and the duties she performed while working at ConopCo and his experience in hiring employees for similar positions with comparable skills, petitioner could earn between $75,000 and $150,000 per year working full-time. Respondent's counsel objected to petitioner's testimony, but the trial court overruled the objection, stating that petitioner "does hire people for these positions. He's testified to the employees that he's hired to fill the positions and what he's paying them. So I'm going to overrule the objection."

¶ 15    The evidence admitted at trial, including tax returns prepared on behalf of the parties and ConopCo, showed the following regarding ConopCo's gross receipts and ordinary business income (after deductions for expenses) as well as the parties' W-2 wages and total income for the years 2012 through 2017:

|  | ConopCo's Gross Receipts | ConopCo's Ordinary Business Income (Loss) | Petitioner's W-2 Box 1 Wages[1] | Respondent's W-2 Box 1 Wages | Personal Business Income (Loss) | Total Personal Income |
|---|---|---|---|---|---|---|
| 2012 | $1,056,657 | $62,193 | $115,856 | --- | $62,962 | $179,306 |
| 2013 | $1,274,118 | ($55,283) | $153,830 | --- | $338,347 | $986,643 |
| 2014 | $1,503,625 | $336,895 | $115,480 | $37,400 | $199,446 | $353,932 |
| 2015 | $1,156,158 | $85,069 | $182,000 | $46,800 | $110,106 | $337,635 |
| 2016 | $1,404,597 | $141,317 | $206,001 | $55,000 | $103,431 | $376,245 |
| 2017 | $1,352,745 | ($77,152) | $206,001 | $55,000 | ($100,380) | $164,982 |

---

[1] W-2 forms for 2012 and 2013 are not included in the record. As such, all wages for these years are listed under petitioner.

The parties' personal business income (or loss) includes income from Never Before Baskets in the following amounts: $1275 in 2012, $3085 in 2013, $2655 in 2014, $2415 in 2015, $3126 in 2016, and $1534 in 2017.

¶ 16    Petitioner attributed the decline in net income at ConopCo from 2016 to 2017 in part to increased business expenses and lack of new contracts, which caused petitioner's own income to decrease as well. Petitioner testified that ConopCo's downturn continued in 2018, as the business executed only six to eight new contracts. Petitioner testified that ConopCo's cash flow problems forced him to reduce his W-2 wages several times in 2018, from $100,000 in annualized W-2 wages at the beginning of the year down to $12,000 in annualized wages by the end of the year. Petitioner also noted that based on the financial condition of the business, ConopCo vacated office space it had in the Prairie Stone Business Park and opened three "temporary" offices—one in his home in Lake Forest, one in Hoffman Estates, and one in Chicago.

¶ 17    Argianas testified that he prepared a preliminary tax return for petitioner and respondent for 2018 based on, *inter alia*, the ConopCo 2018 ledger, a ConopCo 2018 profit and loss statement, and petitioner's mortgage statements. Argianas also created a preliminary tax return for ConopCo and for Prairie Stone Partners. The parties' preliminary tax return reflected that petitioner's wages for the year totaled $113,587, they had business losses in the amount of $72,024, and their total income for the year was $41,653. Argianas testified, however, that all of petitioner's personal expenses that ConopCo paid, totaling approximately $90,212, would be reclassified as additional taxable income to petitioner on his final personal tax return and excluded as business expenses on the ConopCo 2018 corporate tax return.

¶ 18    During the marriage, the parties acquired three parcels of real estate, namely: (1) 15561 Lakeshore Road, Union Pier, Michigan (Michigan Property); (2) 1430 Littlefield Court, Lake

Forest, Illinois (Littlefield Property); and (3) 222 E. Onwentsia Road, Lake Forest, Illinois (Onwentsia Property). The parties used the Michigan Property as a vacation home. The Littlefield Property served as the parties' marital residence until they acquired the Onwentsia Property. After the parties moved into the Onwentsia Property, they rented the Littlefield Property to a third party. The lease on the Littlefield Property was set to expire on May 31, 2019.

¶ 19    Petitioner testified that the parties paid $2.75 million for the Onwentsia Property and spent hundreds of thousands of dollars on renovations before moving in. Petitioner testified that the bank rejected the parties' initial mortgage loan applications for the Onwentsia property three times. The parties then asked Rodis to co-sign the mortgage loan application. Petitioner testified that Rodis told him and respondent that he was co-signing the mortgage out of love for them and had "no intention[] of any ownership interest." At the time the mortgage was secured for the Onwentsia Property, the mortgages on the Littlefield and Michigan Properties were refinanced. During the litigation, petitioner discovered that when Rodis co-signed the parties' mortgage loan applications, the lending bank added Rodis's name to the title of the Onwentsia and Michigan Properties (but not the Littlefield Property) without respondent's or petitioner's knowledge. According to petitioner, however, at no time did Rodis contribute any funds for the purchases, mortgages, real estate taxes, improvements, or any other expenses for the Onwentsia and Michigan Properties.

¶ 20    Throughout the litigation, respondent and the children continued to live in the Onwentsia Property. Petitioner resided at the Onwentsia Property until March 2018, when he voluntarily moved out and rented an apartment in Lake Forest. In July 2018, petitioner moved to a different apartment in Lake Forest located at 415 E. Deerpath Road, where he was living at the time of the trial. Petitioner also operates a ConopCo office out of the Deerpath residence. Petitioner testified that he was strapped for cash flow, primarily as a result of paying the Onwentsia mortgage and

ongoing litigation expenses. To assist him, petitioner's friend, Eric Nixon, began advancing petitioner's rental payments in July 2018. At the time of trial, petitioner owed Nixon approximately $60,000 because of his financial assistance.

¶ 21    The Onwentsia Property was listed for sale by court order in November 2017. Respondent refused to accept the only offer to purchase the property, a cash offer for $2 million in May 2018. Respondent also refused nearly all of petitioner's subsequent requests to reduce the listing price and other alternatives to eliminate its operating costs, even though, as of the time of trial, the parties had received no further offers to purchase the Onwentsia Property. At the time of trial, the Littlefield Property was also for sale. The Michigan property was sold in September 2018 for $850,000. The net proceeds of $347,000 were placed in an escrow account held by respondent's attorney. The parties have received draws from the escrow account for support and attorney fees. At the time of trial, the balance in the escrow account was approximately $200,000.

¶ 22    Prior to the end of the trial, each party sought contribution to their attorney fees from the other party pursuant to sections 503(j), 508(a), and 508(b) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/503(j), 508(a), 508(b) (West 2018)). The court held a contribution hearing at which both parties' attorneys testified.

¶ 23    The parties each submitted written closing arguments on May 3, 2019. Respondent filed a supplement to her trial brief on May 30, 2019, and petitioner filed a response to that supplement on June 11, 2019. The trial court entered the initial judgment of dissolution of marriage on June 26, 2019. In the initial judgment, the trial court found and ordered in relevant part as follows.

¶ 24    Initially, the trial court found that both parties lacked credibility with respect to portions of their testimony. Notably, the court concluded that petitioner's testimony regarding the amount of his annual salary after 2016 was not credible and that both parties lacked an understanding as to

their actions in protracting and extending the litigation. Further, the court found that respondent "had her own issues" in defying court orders and in refusing to follow the Allocation Agreement and the directions of the parenting coordinator. Additionally, the court found that respondent had not been diligent in seeking employment. The court noted that despite the order requiring respondent to submit job diaries on the first day of each month, commencing on November 1, 2017, respondent submitted only four job diaries. Moreover, the court found that respondent chose to apply to places where it was unlikely she would be hired.

¶ 25　The court observed that neither party offered any expert opinion testimony as to the value of petitioner's business interests. The court rejected respondent's request to value petitioner's interest in Pratum at $1,064,052 based on that entity's 2017 tax return, reasoning that "a number on a tax return does not necessarily provide the fair market value" of a closely held entity. Ultimately, the court assigned 100% of the businesses to petitioner. However, to remedy the issue of a lack of valuation testimony regarding the businesses, the court decided to allocate a larger portion of the remaining marital estate to respondent. Accordingly, the court ordered that the parties' assets be divided with 60% going to respondent and 40% going to petitioner.

¶ 26　Based on evidence presented at trial, the trial court determined that Rodis was merely an "accommodation signer" without any ownership interest in the Onwentsia or Michigan Properties. Further, the court noted that both the Onwentsia and Littlefield Properties were for sale. Based on motion practice, the court found that both properties were "underwater" and that "a deficiency is more probable than equity." Finding that the parties are incapable of working together to sell the real estate, the court assigned both properties to petitioner. The court ordered that petitioner was entitled to keep any equity "should there be any" and that he will be solely responsible for any deficiency. The court granted respondent up to 60 days from the date of the entry of the order to

vacate the Onwentsia Property unless the property is sold sooner. Further, based on the parties' inability to compromise on the division of their personal property, the court, with a few limited exceptions, ordered the parties to sell these assets with respondent receiving 60% of the proceeds and petitioner receiving 40% of the proceeds.

¶ 27    The trial court found that respondent was entitled to maintenance and child support. Although petitioner offered into evidence his 2018 tax return, the court found the document unreliable based on evidence that the 2018 tax return was prepared for trial on a preliminary basis with incomplete data. Additionally, the court found credible evidence that petitioner was manipulating ConopCo's books after 2016 to make it appear that the business was in a "downward spiral." Notably, although ConopCo's gross receipts remained steady between 2012 and 2018, the court found that petitioner knowingly inflated his business expenses to artificially decrease his salary in 2017 and 2018. In support of this latter finding, the trial court cited several actions taken by petitioner in 2017 and 2018 that the court found inconsistent with petitioner's representation that ConopCo was operating in a "downward spiral." As such, the court calculated petitioner's gross and net incomes for purposes of establishing his support obligations by averaging those amounts as set forth in the parties' joint 2014, 2015, and 2016 federal income tax returns. Further, the court found credible respondent's testimony that she had no idea that petitioner had compensated her for the work she performed for ConopCo. Accordingly, the court assigned to petitioner the full amount of wages listed on the parties' tax returns and determined that petitioner's average gross income from 2014-2016 was $351,888, and his average net income for the same period was $302,885. Moreover, considering respondent's three years of college, marketing experience through working at ConopCo, and a proven ability to earn between $35,000-$45,000 running her own business, the trial court imputed income to respondent in the amount of $40,000

per year. The court then applied the section 504 maintenance guidelines (750 ILCS 5/504 (West 2018)) and the section 505 child-support guidelines (750 ILCS 5/505 (West 2018)). This resulted in a "reviewable" maintenance award to respondent of $10,105.92 per month for 22 years and a child-support award to respondent of $2648 per month. Both awards were based on worksheets submitted by respondent's attorneys, which were prepared using the Family Law Software program and attached to the judgment. The court declined respondent's request to deviate upwards based on the lifestyle of the parties during the marriage. The court also ordered petitioner to continue to cover the children as dependents on his group medical insurance policy through ConopCo and required him to pay the premiums incident to that coverage.

¶ 28    Finally, the trial court denied both parties' petition for contribution to their attorney fees from the other party. The trial court found that the conduct of both parties unnecessarily increased the cost of the litigation because they "chose a scorched-earth method of litigation," fought over every aspect of this litigation to the detriment of the marital estate, and lacked insight as to their personal responsibility in aggravating and extending the litigation.

¶ 29    On July 8, 2019, Grund & Leavitt, the law firm representing both respondent and Rodis, filed a two-count motion for leave to withdraw and instead sought to file a "limited scope appearance" on respondent's behalf, relating to a motion for clarification of the judgment of dissolution. Grund & Leavitt's motion to withdraw was granted on July 12, 2019, and respondent filed a *pro se* appearance on July 17, 2019.

¶ 30    Meanwhile, on July 10, 2019, respondent filed a motion to clarify the judgment for dissolution of marriage. Respondent's motion to clarify did not raise any issue regarding the trial court's maintenance and child-support determinations or its reliance on the Family Law Software worksheets submitted by respondent's counsel to calculate those amounts. Rather, among the

points raised in respondent's motion were that the judgment omitted the day of the month upon which petitioner was obligated to pay his child-support obligation and neglected to address the medical, dental, and optical expenses incurred for the parties' children during the case. Respondent subsequently filed a motion for leave to file a supplement to her motion to clarify judgment for dissolution of marriage, raising an issue related to the division of one of the parties' bank accounts.

¶ 31 Petitioner filed a motion to reconsider the judgment for dissolution of marriage on July 30, 2019. Among the points raised in petitioner's motion were the following. First, petitioner argued that in its determination of his income for calculating support, the trial court erred by disregarding evidence of ConopCo's diminished gross receipts in the years 2017 and 2018, which had reduced petitioner's income by $100,000. Second, petitioner argued that the trial court erred in imputing income to respondent of only $40,000, despite petitioner's testimony regarding respondent's higher earning potential ($75,000 to $150,000 per year) as well as respondent's failure to comply with the court's order to seek employment. Third, petitioner argued that, in using his average gross income from the 2014 to 2016 tax returns as a basis for setting income for maintenance and child support, the trial court erred by relying on the tax amounts and rates paid in those years to calculate his net income, instead of applying the current tax rates that became effective with the Tax Cuts and Job Act of 2017 (see Pub. L. No. 115-97 (amending the Internal Revenue Code, 26 U.S.C. § 1 *et seq.* (2018)). Fourth, petitioner argued that the trial court erred by making him solely responsible for the children's medical insurance premiums, rather than allocating the cost between the parties. Fifth, petitioner argued that the trial court improperly ordered that his maintenance obligation would be "reviewable" after 22 years, instead of either indefinite or for a fixed term. Finally, petitioner argued that the trial court erred in finding him not credible.

¶ 32 The trial court heard arguments on the motions to reconsider on August 28, 2019, and

September 18, 2019. During the first day of the hearing, Laura Presto of Grund & Leavitt appeared on respondent's behalf. At that time, the trial court stated that its intention was to set guideline maintenance, but the court recognized there were errors in the calculations in the judgment that needed to be recalculated and reduced. Presto acknowledged that the Family Law Software was designed to apply current 2019 tax rates to gross income based on the individualized attributes of the taxpayer. Presto also admitted that there were mathematical errors in respondent's proposed calculations of the guideline amounts but denied that respondent had overridden the Family Law Software calculations. The trial court ordered the parties' lawyers to confer and submit the figures each party used for the Family Law Software calculations of net income, maintenance, and child support, in the hope that the parties could at least "agree to the math." Accordingly, in an order entered on August 28, 2019, the court specifically instructed respondent's counsel to "prepare Family Law Software backup for her calculations [and] submit to Court [and] counsel by 9/18/19." With respect to the health insurance issue, the court stated that it was not changing its finding that petitioner would be solely responsible for the health insurance. In addition, the court stated that it would stand by its finding regarding petitioner's credibility.

¶ 33    At the follow-up hearing on September 18, 2019, David Grund of Grund & Leavitt argued on respondent's behalf. Grund acknowledged that the Family Law Software was "apparently the standard for determining these guidelines in court." Grund then admitted that he "overrode" the Family Law Software calculations applying the 2019 tax code by directly inputting petitioner's net income based on the three-year average of federal income taxes he had paid in 2014-2016 and calculating maintenance and child support on that basis. Grund also, for the first time, challenged the application of the statutory support guidelines (including a claim that they are unconstitutional) and the use of the Family Law Software in the case. In response, petitioner's counsel argued that

it was improper to use the average of actual taxes paid between 2014 and 2016 because the federal tax code that was in existence those years was no longer in effect.

¶ 34    On October 4, 2019, the trial court entered an order addressing the issue of the calculation of maintenance and child support. In the order, the trial court reiterated its intention to award statutory maintenance and child support based on petitioner's average gross income from 2014-2016 (which the trial court, in correcting its own calculations, determined in a footnote was $358,980.33) and based on respondent's imputed income of $40,000 per year. The trial court rejected respondent's argument that the statutory guidelines for child support and maintenance were unconstitutional, noting that respondent had failed to comply with Illinois Supreme Court Rule 19 (eff. Sept. 1, 2006) (requiring that a notice of claim of unconstitutionality to be served on certain parties). Regarding whether to calculate petitioner's net income based on the 2014-2016 tax returns in evidence, or based on the current tax code, the trial court noted that there was no case law to guide its determination, only the language of the relevant statutes. Noting that section 505 of the Act required the net income for support to be determined using "properly calculated" federal and state taxes and that this means applying the same tax code used in the standardized net income table promulgated by Illinois for setting guideline support, the trial court ruled that the current tax code should be used and "[g]iven the complexity of the tax code, it is not unreasonable for the parties to utilize the Family Law Software to calculate net income." The trial court therefore ordered the parties to re-calculate petitioner's net income and guideline support amounts using the corrected average gross income amount of $358,980.33 within seven days.

¶ 35    On October 22, 2019, petitioner filed a motion to vacate the finding in the footnote of the October 4, 2019, order. Petitioner argued that the trial court's recalculation of his average net income from 2014-2016 incorrectly included "other" income from assets that the parties either no

longer possessed or that had been divided in the divorce with more than half of these assets awarded to respondent. At the November 5, 2019, hearing on petitioner's motion, the trial court affirmed that the calculation of his 2014-2016 average gross income was to include income from all sources. Based on that determination, the trial court again "fix[ed] the math," ruled that the average of petitioner's gross income for calculating support was $362,981, and entered an order in accordance with its ruling.

¶ 36    The trial court entered an amended judgment for dissolution of marriage on November 22, 2019. Referencing the November 5, 2019, hearing and the October 4, 2019, order, the trial court determined that petitioner's gross annual income was $362,981 ($30,248.41 per month), his net annual income was $249,288, and respondent's imputed gross annual income was $40,000 ($3,333 per month). On that basis, the court calculated statutory guideline maintenance to be $6123.75 per month for an indefinite term. The trial court also awarded child support in the amount of $1929 per month. The trial court indicated that the maintenance and child-support awards were based on worksheets submitted by petitioner's attorneys, which were prepared using the Family Law Software program and reflected its reconsideration of the judgment of dissolution based on the court's October 4 and November 5, 2019, orders. Further, the trial court ordered that petitioner would be responsible for 60% and respondent would be responsible for 40% of the children's uncovered medical and dental expenses and agreed-upon extracurricular activities, and that petitioner would be responsible for 100% of the children's health insurance premiums. The amended judgment also reiterated that neither party was entitled to contribution to their attorney fees from the other party. Finally, the amended judgment denied petitioner's motion to reconsider with respect to the court's findings regarding petitioner's credibility, the court's rejection of the 2017 and 2018 tax returns to calculate petitioner's income, and the court's calculation of the

amount of income imputed to respondent. The amended judgment provides that it is final as to all issues relating to the petition for dissolution of marriage and the cross-petition and that there is no just reason for delaying either the enforcement or appeal of the amended judgment of dissolution.

¶ 37    This appeal followed. Respondent filed her notice of appeal, once again represented by Grund & Leavitt, on December 18, 2019. Petitioner filed a *pro se* notice of cross-appeal on December 27, 2019. Berger Schatz filed an additional appearance in the appeal on November 4, 2020.

¶ 38                                II. ANALYSIS

¶ 39    On appeal, respondent argues that the trial court erred in (1) determining maintenance and child support and (2) denying her request for contribution to her attorney fees and costs from petitioner. Petitioner challenges the trial court's finding that he lacked credibility and the court's calculation of his income for purposes of setting his support obligations. Petitioner further maintains that the trial court erred by imputing insufficient income to respondent, failing to allocate the cost of maintaining medical insurance for the parties' children in proportion to the parties' respective net incomes, and denying his request for contribution to his legal fees from respondent. We will first address the trial court's credibility finding. We will then address the issues related to maintenance and child support, respondent's imputed income, the allocation of the cost of medical insurance, and contribution to the parties' legal fees. Prior to addressing these issues, however, we must dispose of a motion we ordered taken with the case.

¶ 40                          A. Motion Taken with Case

¶ 41    Respondent filed a motion to strike petitioner's "sur-reply brief" for violations of Illinois Supreme Court Rules 343(b) (effective July 1, 2008) and 341(j) (eff. October 1, 2020). Petitioner has filed a response to respondent's motion to strike. We ordered the motion taken with the case.

¶ 42    Rule 343(b)(1) provides in relevant part as follows:

"(1) *Cross-Appeals*. A cross-appellant shall file a single brief as appellee and cross-appellant at the time his or her brief as appellee is due; the appellant's answer to the arguments on the cross-appeal shall be included in appellant's reply brief ***; and the cross-appellant may file a reply brief confined strictly to replying to those arguments raised on the cross-appeal." Ill. S. Ct. R. 343(b)(1) (eff. July 1, 2008).

Similarly, Rule 341(j) provides that a reply brief "shall be confined strictly to replying to arguments presented in the brief of the appellee and need contain only Argument." Ill. S. Ct. R. 341(j) (eff. Oct. 1, 2020). Respondent argues that petitioner should have labeled his brief as a "reply brief in support of his cross-appeal" instead of a "sur-reply brief." More significantly, respondent contends that petitioner's "sur-reply brief" should be stricken because it is not confined strictly to replying to her answer to the arguments on cross-appeal. Rather, respondent asserts, several passages of the brief constitute an improper "second supplemental response" to her opening brief on appeal. Striking an appellate brief, whether in whole or in part, is a harsh sanction and appropriate only when the violations hinder the court's review. *Burrell v. Village of Sauk Village*, 2017 IL App (1st) 163392, ¶ 14. Here, petitioner's brief does not hamper our ability to consider the issues on appeal. Accordingly, we deny respondent's motion to strike petitioner's "sur-reply brief." Nevertheless, we will disregard any content that violates Rules 343(b) and 341(j).

¶ 43                              B. Petitioner's Credibility

¶ 44    We next address petitioner's claim that the record does not support the trial court's finding that portions of his testimony lacked credibility.

¶ 45    As noted, the trial court addressed both parties' credibility. With respect to petitioner, the trial court noted that, on several occasions throughout the trial, it had to instruct petitioner "to stop

arguing with the questioner and to answer the question" posed. The court commented that the transcript of proceedings "does not capture the belligerent tone or the body language of [petitioner] during the proceedings." The court noted that when respondent was called to the stand as an adverse witness in petitioner's case in chief, petitioner "deliberately turned his back on [respondent], crossed his arms and faced the opposite wall." The court further stated that petitioner "maintained the same belligerent attitude during cross-examination." The court also cited emails admitted into the case by way of trial exhibits and motions as "the best evidence of the manner by which [petitioner] conducted himself during this litigation." The court discussed three of the admitted emails authored by petitioner to others. The court stated that the emails "show that [petitioner] can be demanding, demeaning and difficult."

¶ 46 Additionally, the court found credible evidence that petitioner was manipulating ConopCo's books after 2016 to make it appear that the business was in a "downward spiral." Notably, although ConopCo's gross receipts remained steady between 2012 and 2018, the court found that petitioner knowingly inflated his business expenses to artificially decrease his salary in 2017 and 2018. In support of this latter finding, the trial court cited several actions taken by petitioner in 2017 and 2018 that the court found inconsistent with petitioner's representation that ConopCo was operating in a "downward spiral." Among the actions cited by the trial court in support of its finding are the following: (1) petitioner paid a $100,000 capital call before it was due; (2) petitioner continued to pay his employees "significant" annual bonuses and salaries; (3) from 2016 to 2017, petitioner increased the wages paid to his employees by $117,110; (4) the contributions to ConopCo's employees' pension and profit-sharing plans for 2017 exceeded the average of the preceding three years (2014-2016) by more than $100,000; (5) in 2018, petitioner continued to pay Beecroft a full salary even though she was not working full time due to an illness;

(6) in 2017, petitioner paid Beecroft an extra $1000 per month in June, July, September, November, and December; (7) petitioner bought a Jeep for $5000 and then "sold" it to Beecroft for $1000; (8) petitioner hosted an "expensive" holiday party for his employees; (9) ConopCo made generous charitable donations despite its allegedly precarious financial situation; (10) petitioner paid for a concierge physician for himself at a cost of $6000 per year; (11) petitioner "hired" his sister to work for ConopCo, paying her $50,000 in 2017, without adequately testifying what she did, how she was qualified to complete the work, or the hours she worked; (12) petitioner paid his sister $15,000 for work in the first quarter of 2018, the same amount that his sister tendered to petitioner's counsel for attorney fees; (13) petitioner represented on an October 2017 loan application for a vehicle that he earned $39,000 per month (the equivalent of $468,000 annually), well in excess of the income he reported on either his 2016 or 2017 federal tax returns; (14) ConopCo's rent expense increased despite the fact that the lease for ConopCo's headquarters expired in early spring of 2018 and petitioner moved his office space into his home; and (15) in his proposed judgment, petitioner asked the court to grant him 100% interest in the Onwentsia and Littlefield Properties with the stated intent to refinance them despite his claim that ConopCo was in a financial crisis. Ultimately, the court concluded:

> "After listening to [petitioner] testify, and after watching his courtroom demeanor, and after reviewing his communications with others, *** [petitioner] has little or no acceptance or recognition of his own contributions to the extended and protracted litigation in this matter. Additionally, as discussed in the section setting maintenance, the Court finds [petitioner's] testimony regarding the amount of his annual salary after 2016 not credible."

¶ 47    Questions of witness credibility are inherently matters for the trial court to resolve. *In re Marriage of Sturm*, 2012 IL App (4th) 110559, ¶ 6; see also *In re Marriage of Manker*, 375 Ill.

App. 3d 465, 477 (2007) ("The trier of fact is charged with assessing the credibility of testimony at trial."). Courts of review defer to the trial court on credibility issues because the trial court, by virtue of its ability to actually observe the conduct and demeanor of a witness, is in the best position to assess his or her credibility. *In re Marriage of Cotton*, 103 Ill. 2d 346, 356 (1984); *Manker*, 375 Ill. App. 3d at 477. We will overturn a trial court's credibility determination only if it is against the manifest weight of the evidence. *In re Marriage of Whitehead*, 2018 IL App (5th) 170380, ¶ 21; *In re Marriage of Kaplan*, 149 Ill. App. 3d 23, 28 (1986). A finding is against the manifest weight of the evidence only if an opposite conclusion is clearly apparent or if the findings appear unreasonable, arbitrary, or not based on the evidence. *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶ 44.

¶ 48    Applying the foregoing standards, we conclude that the trial court's determination of petitioner's credibility was not against the manifest weight of the evidence. The trial court's credibility determination was based primarily upon its assessment of petitioner's demeanor throughout the proceedings and inconsistencies between petitioner's actions after 2016 relative to his claim that ConopCo was operating in a "downward spiral." As noted, because this court did not personally view petitioner's testimony, we must defer to the trial court's conclusion regarding petitioner's demeanor. *Cotton*, 103 Ill. 2d at 356; *Kaplan*, 149 Ill. App. 3d at 28. In this regard, the trial court expressly drew attention to the fact that the transcript of proceedings did not capture the belligerent tone or body language of petitioner during the proceedings. Nothing in the record establishes that the trial court's conclusion regarding petitioner's demeanor was against the manifest weight of the evidence. With respect to the trial court's finding of inconsistences between petitioner's actions after 2016 relative to his claim that ConopCo was operating in a "downward spiral," there is ample evidence to support this conclusion. Petitioner attributed the alleged

downfall to additional or unexpected business costs. However, the trial court noted that petitioner's actions—such as increasing the wages and pension benefits paid to his employees, paying employees significant annual bonuses, hosting expensive holiday festivities, making significant charitable donations on ConopCo's behalf, and paying for a concierge physician for himself— belied his claim that the business was operating in a downward spiral. The court also cited attempts by petitioner to move money through the business without having it assigned to him as income as well as statements about his salary on a vehicle loan application. Considering the record presented to us, we find no basis to conclude that the trial court's determination regarding petitioner's credibility was against the manifest weight of the evidence.

¶ 49    Petitioner acknowledges that the trial court's determination of witness credibility is entitled to great deference. Nevertheless, he asserts that the trial court's credibility determinations are not conclusive and do not bind the reviewing court. *People v. Gray*, 2017 IL 120958, ¶ 35. Petitioner urges this court to disregard the trial court's finding that he lacked credibility and to "view the evidence with a less biased view towards [him]." In support, petitioner argues that the examples the trial court cited as calling his credibility into question are not the kinds of behaviors that reflect dishonesty. For instance, petitioner asserts that the incident referenced by the trial court—when he turned his back during respondent's testimony—does not accurately reflect what transpired in court. Petitioner points out that during a colloquy with the court after the incident, he explained that he "silently turned away" during respondent's testimony because "he was overcome with emotion." Petitioner argues that the "[p]resence of emotion does not equal absence of credibility." However, it was not the fact that petitioner exhibited emotion that the court found to have impacted his credibility. Rather, it was the rude and disrespectful *manner* in which he did so. A witness's demeanor impacts upon his or her credibility. See *People v. Carter*, 2021 IL App (4th) 180581,

¶ 70 (noting that in assessing credibility, a trial court evaluates, *inter alia*, visual cues such as demeanor and body language and audio cues such as tone); *People v. Reed*, 80 Ill. App. 3d 771, 781-82 (1980) (noting that a trial court appraises witness credibility through observation of their demeanor at trial). By virtue of its ability to observe petitioner's conduct and demeanor, the trial court was in a better position to assess petitioner's credibility than we are. *Manker*, 375 Ill. App. 3d at 477.

¶ 50    Petitioner also suggests that the trial court treated him differently than it treated respondent when she was overcome with emotion on the witness stand. Petitioner notes that during questioning by his attorney regarding respondent's relationship with her father, respondent began crying. At that time, the court told respondent that there were tissues in front of her. The court also asked respondent's attorney if he had any water for his client. Based on this record, petitioner asserts that when he "was overcome with emotion during trial, and quietly turned away so as not to face [respondent] who was on the stand, he was harshly reprimanded by the judge." Yet, he continues, when  respondent "was overcome with emotion while on the witness stand, she was treated with solicitous kindness by everyone in the courtroom and her emotional reaction was *never cited* as a basis for finding her to be 'not credible.' " (Emphasis in original.) We reiterate, however, that it was not the fact that petitioner exhibited emotion that impacted upon his credibility. Instead, it was the rude and disrespectful *manner* in which he did so. As such, petitioner's comparison of these two situations in an attempt to disturb the trial court's credibility determination is not well taken.

¶ 51    Finally, petitioner argues that while he may come off as "rude or pushy" in the email communications cited by the trial court, "there is no indication that any of the statements he made were untrue or tended to undermine [his] veracity." Respondent overlooks the reason the trial court

cited the email communications. The trial court did not cite the email communications for their content, but rather as a reflection of petitioner's demeanor while testifying at trial. Thus, we find no error.

¶ 52    In closing, we further observe that even if we were to agree with one or more of petitioner's arguments, they would not compel a finding that the court's ultimate credibility determination was erroneous. The trial court had the opportunity to view petitioner's live testimony and weigh that testimony. Considering the record below and the trial court's findings, we find no basis in the record to conclude that the trial court's credibility determination was against the manifest weight of the evidence.

¶ 53                                    C. Support Obligations

¶ 54    Next, we address the parties' arguments related to the trial court's determination of child support and maintenance.

¶ 55    At the outset, we note that awards of maintenance and child support are presumed to be correct. *In re Marriage of Lugge*, 2020 IL App (5th) 190046, ¶ 15; *In re Marriage of Brill*, 2017 IL App (2d) 160604, ¶ 26. Generally, we review maintenance and child-support awards for an abuse of discretion. *In re Marriage of Schneider*, 214 Ill. 2d 152, 173 (2005) (maintenance); *In re Marriage of Moorthy*, 2015 IL App (1st) 132077, ¶ 41 (child support). An abuse of discretion occurs when a trial court's finding is arbitrary or fanciful or where no reasonable person would agree with the trial court's decision. *Brill*, 2017 IL App (2d) 160604, ¶ 26. However, when a party challenges a trial court's factual findings regarding a support obligation, we will not reverse those findings unless they were against the manifest weight of the evidence. *Brill*, 2017 IL App (2d) 160604, ¶ 30 (maintenance); *Moorthy*, 2015 IL App (1st) 132077, ¶ 41 (child support). A finding of fact is against the manifest weight of the evidence where the opposite conclusion is clearly

apparent or where the finding is unreasonable, arbitrary, or not based on the evidence. *Romano*, 2012 IL App (2d) 091339, ¶ 44. To the extent the issues presented involve an issue of statutory construction, our review is *de novo*. *In re Marriage of Carstens*, 2018 IL App (2d) 170183, ¶ 28. With these principles in mind, we address the parties' claims, beginning with those of respondent.

¶ 56                              1. Respondent's Arguments

¶ 57    Respondent argues that the trial court erred in determining the maintenance and child-support awards. Respondent advances various subarguments in support of this assignment of error, which we address in the following order. First, respondent argues that the trial court improperly relied on Family Law Software calculations to set petitioner's net income and his support obligations. Second, respondent argues that the trial court "misconstrued" a provision of the Act (750 ILCS 5/101 *et seq.* (West 2016)) in calculating petitioner's support obligations. Third, respondent contends that the trial court should have deviated upwards from the statutory support guidelines and its failure to do so constituted an abuse of discretion.

¶ 58    Petitioner responds that the reasons cited by respondent in support of her claim that the trial court erred in determining the maintenance and child-support awards are not well founded. Petitioner contends that respondent is estopped from complaining about the trial court's use of the Family Law Software. Petitioner also maintains that the trial court properly applied the relevant provisions of the Act in calculating his support obligations. Finally, petitioner asserts that the trial court properly declined to deviate from the statutory support guidelines.

¶ 59                              a. Family Law Software

¶ 60    Respondent argues that the trial court's reliance on Family Law Software to determine petitioner's tax liability and net income resulted in maintenance and child-support calculations that were incorrect. According to respondent, the trial court's reliance on the Family Law Software

calculations was improper because the calculations were "computer-generated evidence" and petitioner failed to call a "qualified expert witness" to lay a proper foundation for the introduction of the Family Law Software calculations. In support of her position, respondent relies on *People v. Mormon*, 97 Ill. App. 3d 556 (1981), which sets forth foundational requirements for computer-generated records.

¶ 61    Citing the rule of acquiescence or invited error, petitioner replies that respondent is estopped from complaining about the trial court's use of the Family Law Software because (1) respondent submitted to the court calculations using the Family Law Software and (2) the first time respondent challenged the trial court's use of the Family Law Software was during oral argument on September 18, 2019, after the parties had filed their motions to reconsider and their responses.

¶ 62    The rule of acquiescence or invited error is a form of procedural default sometimes also described as estoppel. *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004). The rule prohibits a party from requesting to proceed in one manner and then arguing on appeal that the requested action was error. *Pellico v. Mork*, 2018 IL App (2d) 170468, ¶ 20; *In re Marriage of Reidy*, 2018 IL App (1st) 170054, ¶ 29. The rationale for the rule is that it would be manifestly unfair to grant a party relief based on an error that the party introduced into the proceedings. *Gaffney v. Board of Trustees of the Orland Fire Protection District*, 2012 IL 110012, ¶ 33. Even if we were to assume that it was error for the trial court to rely on the Family Law Software calculations, we agree with petitioner that respondent is estopped from complaining about the alleged error pursuant to the rule of acquiescence or invited error.

¶ 63    As petitioner correctly notes, respondent submitted income and support obligation calculations to the court using the Family Law Software. In this regard, the record establishes that

respondent's "Trial Brief and Closing Argument," filed May 3, 2019, includes an "Illinois Child Support Guideline Calculation" that was prepared by respondent's counsel using the Family Law Software and contains income and child-support calculations. Moreover, in the original judgment of dissolution, the trial court attached two documents as exhibits—an "Illinois Maintenance Worksheet" and an "Illinois Child Support Guideline Calculation." Both of these attachments were prepared by respondent's counsel using the Family Law Software and include income and support obligation calculations.

¶ 64 We further observe that when respondent filed her motion to clarify the judgment of dissolution on July 10, 2019, she sought clarification regarding aspects of the judgment with respect to the issue of child support. However, she made no mention of the trial court's reliance on the Family Law Software calculations. Subsequently, on August 21, 2019, when respondent filed her response to petitioner's motion to reconsider the judgment of dissolution of marriage, she once again submitted several pages of Family Law Software calculations. And, nothing in her response suggests that it was improper for the trial court to rely on the Family Law Software calculations in the original judgment of dissolution.

¶ 65 The court held a hearing on the parties' post-judgment motions on August 28, 2019. At that hearing, Presto, who appeared on respondent's behalf, did not challenge the trial court's reliance on the Family Law Software calculations. To the contrary, she acknowledged that she used the Family Law Software to calculate petitioner's income and support obligations. She represented that the Software uses "the current taxes" and calculates "the proper 2019 taxes." Further, Presto relied on the Family Law Software calculations submitted with her response to petitioner's post-judgment motion. At a follow-up hearing on September 18, 2019, Grund argued on respondent's behalf that the maintenance guidelines were "unconstitutional," "speculative," and

"an abomination." He also remarked that "[n]obody has put the software people on the stand and asked them how they calculate tax." Despite these protestations, Grund acknowledged that he used the Family Law Software to determine child support, "[b]ut not [for] maintenance" because the Family Law Software "doesn't work in connection with the *** formula for maintenance." Nevertheless, he then referenced an "Illinois Maintenance Worksheet" prepared by Presto using the Family Law Software.

¶ 66    As the foregoing establishes, respondent repeatedly utilized the Family Law Software in her filings and arguments in this case. She submitted Family Law Software calculations with her original closing argument, she never contested that Family Law Software calculations were inappropriate in her post-judgment motion, and she submitted her own Family Law Software calculations in response to petitioner's post-judgment motion. Under these circumstances, even if we were to assume that it was error for the trial court to rely on the Family Law Software calculations, respondent is estopped from complaining about it pursuant to the rule of acquiescence or invited error. *In re Marriage of Britton*, 2022 IL App (5th) 210065, ¶ 48.

¶ 67    In her reply brief, respondent insists that any claim that her argument is barred under the rule of acquiescence or invited error is a "red herring." Respondent concedes that she used the Family Law Software, but claims that at the time the parties submitted their respective written arguments and proposed dissolution judgments, "there was no dispute regarding whether the use of the Illinois Family Law Software program was the appropriate methodology for calculating maintenance and child support in the instant case." Respondent claims that this issue "did not arise until much later in the proceedings." Specifically, respondent states that the issue of the appropriateness of using the Family Law Software first arose during the September 18, 2019, hearing after petitioner, in his reconsideration motion, "attacked the trial court's methodology for

reaching its maintenance and child-support amounts in the Judgment." We find respondent's argument disingenuous. In his motion for reconsideration, petitioner expressly argued that the trial court erred in determining his net income for support purpose and in setting the amount of maintenance and child support. Petitioner provided a detailed and comprehensive analysis supported by Family Law Software calculations. Nevertheless, when respondent filed her response to petitioner's motion for reconsideration, she did not argue that it was improper for the trial court to rely on the Family Law Software calculations in the original judgment of dissolution. To the contrary, she once again submitted several pages of Family Law Software calculations. Given these circumstances, respondent's argument that the propriety of using the Family Law Software first arose during the September 18, 2019, hearing is not well taken.

¶ 68                          b. Calculation of Petitioner's Net Income

¶ 69    Next, respondent contends the trial court "misconstrued" the Act in determining petitioner's net income for purposes of calculating his support obligations. To place this argument in context, it is helpful to set forth the relevant statutory provisions.

¶ 70    Awards of child support are governed by section 505 of the Act (750 ILCS 5/505 (West 2018)). That section provides that the court may order either or both parents owing a duty of support to pay an amount that is "reasonable and necessary" for support. 750 ILCS 5/505(a) (West 2018). In calculating an award of child support, the court must first determine each party's gross and net incomes. Subject to exceptions not applicable here, the child-support statute defines "gross income" as "the total of all income from all sources." 750 ILCS 5/505(a)(3)(A) (West 2018). In turn, "net income" is defined in pertinent part as "gross income minus either the standardized tax amount calculated pursuant to subparagraph (C) of this paragraph (3) or the individualized tax amount calculated pursuant to subparagraph (D) of this paragraph (3)." 750 ILCS 5/505(a)(3)(B)

(West 2018).

¶ 71    The term "standardized tax amount" means "the total of federal and state income taxes for a single person claiming the standard tax deduction, one personal exemption, and the applicable number of dependency exemptions for the minor child or children of the parties, and Social Security and Medicare tax calculated at the Federal Insurance Contributions Act rate." 750 ILCS 5/505(3)(C) (West 2018). The standardized tax amount method uses a schedule published by the Illinois Department of Healthcare and Family Services showing the net income that corresponds to a given amount of gross income. 750 ILCS 5/505(a)(1), (a)(3)(C)(II) (West 2018); see 2019 Addendum to the Illinois Schedule of Basic Obligations and Standardized Net Income Table, March 11, 2019. The term "individualized tax amount" is defined as the aggregate of "federal income tax (properly calculated withholding or estimated payments)," "[s]tate income tax (properly calculated withholding or estimated payments)," and "Social Security or self-employment tax, if applicable (or, if none, mandatory retirement contributions required by law or as a condition of employment) and Medicare tax calculated at the Federal Insurance Contributions Act rate." 750 ILCS 5/505(3)(D) (West 2018).

¶ 72    In calculating "net income," the child-support statute requires the use of the "standardized tax amount *** unless the requirements for an individualized tax amount set forth in subparagraph (E) of this paragraph (3) are met." 750 ILCS 5/505(3)(B) (West 2018). Section 505(3)(E) of the Act provides as follows

    "(E) In lieu of a standardized tax amount, a determination of an individualized tax amount may be made under items (I), (II), or (III) below. If an individualized tax amount determination is made under this subparagraph (E), all relevant tax attributes (including filing status, allocation of dependency exemptions, and whether a party is to claim the use

of the standard deduction or itemized deductions for federal income tax purposes) shall be as the parties agree or as the court determines. To determine a party's reported income, the court may order the party to complete an Internal Revenue Service Form 4506-T, Request for Tax Transcript.

>    (I)    Agreement. Irrespective of whether the parties agree on any other issue before the court, if they jointly stipulate for the record their concurrence on a computation method for the individualized tax amount that is different from the method set forth under subparagraph (D), the stipulated method shall be used by the court unless the court rejects the proposed stipulated method for good cause.

>    (II)   Summary hearing. If the court determines child support in a summary hearing under Section 501 and an eligible party opts in to the individualized tax amount method under this item (II), the individualized tax amount shall be determined by the court on the basis of information contained in one or both parties' Supreme Court approved Financial Affidavit (Family & Divorce Cases) and relevant supporting documents under applicable court rules. No party, however, is eligible to opt in unless the party, under applicable court rules, has served the other party with the required Supreme Court approved Financial Affidavit (Family & Divorce Cases) and has substantially produced supporting documents required by the applicable court rules.

>    (III)  Evidentiary hearing. If the court determines child support in an evidentiary hearing, whether for purposes of a temporary order or at the conclusion of

a proceeding, item (II) of this subparagraph (E) does not apply. In each such case (unless item (I) governs), the individualized tax amount shall be as determined by the court on the basis of the record established." 750 ILCS 5/505(3)(E) (West 2018).

¶ 73 An award of maintenance in a dissolution proceeding is governed by section 504 of the Act (750 ILCS 5/504 (West 2018)). That statute provides that a trial court "may grant a maintenance award for either spouse in amounts and for periods of time as the court deems just." 750 ILCS 5/504(a) (West 2018). If the trial court determines that maintenance is appropriate, it must determine the amount of the award. 750 ILCS 5/504(b-1) (West 2018); *In re Marriage of Hamilton*, 2019 IL App (5th) 170295, ¶ 108. Generally, if the parties' combined "gross annual income" is less than $500,000, maintenance is calculated by using a guideline formula set forth in the Act. 750 ILCS 5/504(b-1)(1)(A) (West 2018). Under the guideline formula, the amount of maintenance is calculated by taking 33-1/3% of the payor's "net annual income" and subtracting 25% of the payee's "net annual income." 750 ILCS 5/504(b-1)(1)(A) (West 2018). For purposes of the maintenance statute, the terms "gross income" and "net income" have the same definitions as the legislature ascribed to them in the child-support statute "except maintenance payments in the pending proceedings shall not be included." 750 ILCS 5/504(b-3), (b-3.5) (West 2018).

¶ 74 Returning to respondent's argument, we observe that the trial court in this case calculated petitioner's net income using the individualized tax amount approach. Respondent argues that under this method, the trial court was obligated, pursuant to the plain language of section 505(a)(3)(E)(III) of the Act (750 ILCS 5/101 *et seq*. (West 2018)), to determine petitioner's "individualized tax amount," and in turn his support obligations, "on the basis of the record established." Respondent observes that the trial court calculated petitioner's gross income by

averaging the total income set forth on the parties' 2014, 2015, and 2016 tax returns. Because the parties' tax returns for 2014 through 2016 were admitted into evidence, respondent asserts that the trial court should have calculated petitioner's "individualized tax amount," and, in turn his net income, by averaging the actual taxes paid in 2014, 2015, and 2016, as reflected on the parties' tax returns, and subtracted this amount from petitioner's average gross income during the same three-year period. According to respondent, however, instead of correctly construing section 505(a)(3)(E)(III) in accordance with its plain language, the trial court disregarded the record established and calculated petitioner's taxes as well as his net income at the time of trial using the Family Law Software.

¶ 75    Petitioner responds that the trial court properly determined his net income for purposes of establishing his support obligations. According to petitioner, respondent's position ignores the plain language of the Act (750 ILCS 5/504, 505 (West 2018)). Notably, petitioner argues that, when using the "individualized tax amount" approach to calculate net income, the Act requires the court to use federal and state income tax that has been "properly calculated." 750 ILCS 5/505(a)(3)(D)(I), (II) (West 2018); see also 750 ILCS 5/504(b-3.5) (West 2018). Thus, petitioner reasons, regardless of how the trial court determined his gross income, his net income must be calculated based on the tax laws in effect in 2019. Petitioner observes that the federal tax law in effect in 2019 was the "Tax Cuts and Jobs Act of 2017" (TCJA), which was signed into law on December 21, 2017, as Public Law No. 115-97 (Pub. L. No. 115-97) (amending the Internal Revenue Code, 26 U.S.C. § 1 *et seq*. (2018)). Petitioner notes that the TCJA changed the tax rates for individuals, limited certain itemized deductions, and eliminated the deductibility of maintenances payments beginning in 2018.

¶ 76    The issue presented is one of statutory construction. The primary objective of statutory

construction is to ascertain and give effect to the intent of the legislature. *State Bank of Cherry v. CGB Enterprises, Inc.*, 2013 IL 113836, ¶ 56. The most reliable indicator of legislative intent is the language of the statute itself, given its plain and ordinary meaning. *State Bank of Cherry*, 2013 IL 113836, ¶ 56. If the statutory language is clear and unambiguous, it must be applied as written, without resorting to further aids of statutory construction. *State Bank of Cherry*, 2013 IL 113836, ¶ 56. We must view the enactment as a whole and interpret it in light of all relevant provisions. *People v. Leib*, 2022 IL 126645, ¶ 28; *Village of Downers Grove v. Village Square III Condominium Ass'n*, 2022 IL App (2d) 210098, ¶ 51. A court may not depart from the plain language of the statute and read into it exceptions, limitations, or conditions that are not consistent with the express legislative intent. *State Bank of Cherry*, 2013 IL 113836, ¶ 56. As noted earlier, we review issues of statutory construction *de novo*. *Carstens*, 2018 IL App (2d) 170183, ¶ 28.

¶ 77     Applying the foregoing standards, we agree with petitioner that the trial court properly determined his net income under the individualized tax amount approach based on the tax law in effect at the time the calculation was made. As relevant here, the Act defines "net income" as "gross income minus *** the individualized tax amount." 750 ILCS 5/505(a)(3)(B) (West 2018). A party's "individualized tax amount" consists of, *inter alia*, the aggregate of federal and state income taxes based on "*properly calculated withholding* or estimated payments." (Emphasis added.) 750 ILCS 505/5(a)(3)(D) (West 2018). As this court has previously stated, "[p]roperly calculated withholding is, by definition, withholding that coincides with the actual tax owed on one's gross income." *In re Marriage of Ackerly*, 333 Ill. App. 3d 382, 391 (2002); see also *In re Marriage of Blume*, 2016 IL App (3d) 140276, ¶ 39 ("A properly calculated withholding is the amount of properly calculated taxes owed from a person's gross income"). But, contrary to respondent's position, the average amount of taxes the parties' paid on their gross income between

2014 and 2016, will not necessarily reflect the actual taxes owed on the same amount of income earned in 2019 given changes to the federal tax code by the TCJA. As one commentator has noted, the TCJA "is the most significant change to the Code since the Tax Reform Act of 1986." Shroff, Arpita A., The Tax Cuts and Jobs Act—Individual Tax Reform, Journal of Taxation, 129 JTAX 30, 30 (August 2018). Among other things, the TCJA revised the tax brackets, suspended personal exemptions, eliminated the deductibility of maintenance payments, and limited certain itemized deductions. Shroff, Arpita A., The Tax Cuts and Jobs Act—Individual Tax Reform, Journal of Taxation, 129 JTAX 30, 30-34 (August 2018).

¶ 78    Moreover, use of the current tax law is consistent with the standardized tax amount approach. See *Leib*, 2022 IL 126645, ¶ 28 (noting that a court construes a statute as a whole in light of all relevant provisions); *Village of Downers Grove*, 2022 IL App (2d) 210098, ¶ 51 (same). As noted, the "standardized tax amount" means "the total of federal and state income taxes for a single person claiming the standard tax deduction, one personal exemption, and the applicable number of dependency exemptions for the minor child or children of the parties, and Social Security and Medicare tax calculated at the Federal Insurance Contributions Act rate." 750 ILCS 5/505(3)(C) (West 2018). The standardized tax amount method uses a schedule published by the Illinois Department of Healthcare and Family Services showing the net income that corresponds to a given amount of gross income. 750 ILCS 5/505(a)(1), (a)(3)(C)(II) (West 2018). With respect to federal withholding, the schedule uses the federal income withholding formula published by the Internal Revenue Service. Technical Documentation: Illinois Schedule of Basic Obligations and Standardized Net Income Table, June 12, 2017, at 21. Moreover, the schedule is frequently updated. See, *e.g.*, 2019 Addendum to the Illinois Schedule of Basic Obligations and Standardized Net Income Table, March 11, 2019, at 1-2; 2018 Addendum to the Illinois Schedule of Basic

Obligations and Standardized Net Income Table, March 1, 2018. In 2018, for instance, the schedule was updated "for federal tax reform, aka the Tax Cuts and Jobs Act ***, that became effective January 1, 2018." 2018 Addendum to the Illinois Schedule of Basic Obligations and Standardized Net Income Table, March 1, 2018, at 1-2. Similarly, in 2019, the schedule was updated "for federal and state income taxes and FICA that became effective January 1, 2019." 2019 Addendum to the Illinois Schedule of Basic Obligations and Standardized Net Income Table, March 11, 2019, at 1-2. The 2019 addendum specifies that "The Tax Cuts and Jobs Act *** that was passed December 2017 and became effective January 1, 2018 significantly changed taxes from 2017 to 2018." 2019 Addendum to the Illinois Schedule of Basic Obligations and Standardized Net Income Table, March 11, 2019, at 2. Accordingly, the position advanced by respondent, *i.e.*, calculating petitioner's net income by using the average of taxes the parties paid on their gross income between 2014 and 2016, is contrary to the plain language of the statute as it will not result in an accurate or correct "individualized tax amount" calculation.

¶ 79    We are also unpersuaded by respondent's claim that, instead of correctly construing section 505(a)(3)(E)(III) in accordance with its plain language, the trial court disregarded the record and erred by calculating petitioner's taxes as well as his net income at the time of trial using the Family Law Software. At the conclusion of the trial, both parties submitted written closing arguments to the court. Further, both parties attached to their closing trial briefs "Illinois Child Support Guideline" worksheets prepared with the Family Law Software. Although the figures used on the worksheets originally submitted did not reflect the ultimate support awarded, the parties calculated petitioner's taxes and resulting net income using the Family Law Software. And, as respondent's counsel acknowledged at the August 2019 hearing, the Family Law Software uses "the current taxes" and calculates "the proper 2019 taxes." Thus, the record contains evidence to support the

trial court's decision to determine petitioner's net income based on the tax law in effect at the time the calculation was made.

¶ 80     Given the foregoing, the trial court properly determined petitioner's net income for purposes of establishing his support obligations by using the tax laws in effect at the time the calculation was made.

¶ 81                              c. Deviation from Support Guidelines

¶ 82     Next, respondent argues that the trial court erred by failing to find that an application of the statutory maintenance and child-support guidelines was inappropriate under the facts of this case and by failing to deviate above those guidelines.

¶ 83     Prior to addressing this argument, we note that petitioner argues that respondent forfeited this argument because (1) she failed to cite any legal support for her claim and (2) her " 'argument' is not supported by any actual argument." To be sure, the failure to elaborate on an argument, cite persuasive authority, or present a well-reasoned theory violates Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) and may result in a party forfeiting consideration of the issue. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (requiring the appellant's brief to contain "the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on" and providing that "[p]oints not argued are forfeited"); *Vancura v. Katris*, 238 Ill. 2d 352, 369 (2010) ("Both argument and citation to relevant authority are required. An issue that is merely listed or included in a vague allegation of error is not 'argued' and will not satisfy the requirements of the rule"); *Kic v. Bianucci*, 2011 IL App (1st) 100622, ¶ 23 ("A failure to cite relevant authority violates Rule 341 and can cause a party to forfeit consideration of the issue"); *Sakellariadis v. Campbell*, 391 Ill. App. 3d 795, 804 (2009) ("The failure to assert a well-reasoned argument supported by legal authority is a violation of Supreme Court Rule 341(h)(7) [citation],

resulting in waiver"); *People v. Patel*, 366 Ill. App. 3d 255, 274 (2006) (holding that points not supported by adequate argument are forfeited). Although respondent does not cite any case law in her opening brief, she does present argument and cites to various provisions of the Act relating to the deviation from the maintenance and child-support guidelines. The argument presented is adequate to frame the issue raised and the statutory citations provide at least some amount of support necessary for this court to review her challenge to the trial court's ruling on the issue presented. Accordingly, we decline to consider respondent's arguments forfeited and proceed to the merits thereof.

¶ 84                                            (1). Maintenance

¶ 85    As noted above, the maintenance statute provides that a trial court "may grant a maintenance award for either spouse in amounts and for periods of time as the court deems just." 750 ILCS 5/504(a) (West 2018). Section 504(a) lists several factors that the court must consider, where relevant, when determining whether to award maintenance. 750 ILCS 5/504(a)(1)-(14) (West 2018). Those factors include: (1) the income and property of each party, including marital property apportioned to each party; (2) the needs of each party; (3) the realistic present and future earning capacity of each party; (4) any impairment to earning capacity of the party seeking maintenance because he or she devoted time to domestic duties or forewent opportunities for education or training because of the marriage; (5) any impairment to earning capacity of the party against whom maintenance is sought; (6) the time necessary for the party seeking maintenance to acquire appropriate education, training, or employment; (7) the standard of living established during the marriage; (8) the duration of the marriage; (9) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties; (10) all sources of income; (11) the tax consequences of each party; and (12)

contribution and services by the party seeking maintenance to the education, training, or career of the other party. 750 ILCS 5/504(a)(1)-(13) (West 2018). The court may also consider any other factors it deems "just and equitable." 750 ILCS 5/504(a)(14) (West 2018).

¶ 86    If the trial court determines that maintenance is appropriate, it must determine the amount and duration of the award. 750 ILCS 5/504(b-1) (West 2018); *Hamilton*, 2019 IL App (5th) 170295, ¶ 108. As noted, if the parties' combined gross annual income is less than $500,000, maintenance is generally calculated using a guideline formula set forth in the Act. 750 ILCS 5/504(b-1)(1)(A) (West 2018). Under this formula, the amount of maintenance is calculated by taking 33-1/3% of the payor's net annual income and subtracting 25% of the payee's net annual income. 750 ILCS 5/504(b-1)(1)(A) (West 2018). The duration of maintenance is based on the length of the marriage multiplied by a statutory factor. 750 ILCS 5/504(b-1)(1)(B) (West 2018). A trial court may deviate from statutory maintenance guidelines based on a consideration of the same factors used to determine whether a maintenance obligation is appropriate in the first place. 750 ILCS 5/504(b-1)(1), (2), (b-2)(2) (West 2018). If a court deviates from the maintenance guidelines, however, it must make findings as to the amount of maintenance (if determinable) or duration that would have been required under the guidelines and the reasoning for any variance from the guidelines. 750 ILCS5/504(b-2)(2) (West 2018).

¶ 87    Respondent contends that the trial court erred by failing to find that application of the maintenance guidelines was inappropriate given the facts of this case. Respondent claims that application of the guidelines was inappropriate because it was difficult to determine petitioner's true income as petitioner was a self-employed business owner and the trial court "expressly found [that he] manipulated and misrepresented his income." She also argues that application of the guidelines led to a maintenance award that was far below her lifestyle needs based on the standard

of living enjoyed during the marriage. Additionally, respondent argues that given the factors for awards of maintenance set forth in section 504(a) (750 ILCS 5/504(a) (West 2018)), including her limited earning capacity, her prolonged absence from the workforce due to her devoting time to domestic duties, and her age, the court should have found that an award of non-guideline maintenance was appropriate and awarded her maintenance in excess of the statutory guidelines.

¶ 88    In finding that guideline maintenance was appropriate, the trial court considered in detail the factors set forth in section 504(a). The trial court found that petitioner misrepresented his income in 2017 and 2018. For this reason, the court calculated petitioner's gross income by averaging the total income set forth on the parties' 2014, 2015, and 2016 joint income tax return. The court also considered petitioner's educational background and determined that his earning capacity is greater than that of respondent. The court noted that the parties presented very little testimony about their lifestyle prior to the breakdown of the marriage. The court observed, however, that the parties were unable to secure a loan for the Onwentsia Property without having respondent's father co-sign, they are facing a loss on the sale of the Onwentsia and Littlefield Properties, their lifestyles during the marriage were supplemented with now-depleted savings, investments, and inheritances, and they have very few assets left. Based on this record, the court concluded that if the parties' lifestyle prior to the breakdown of the marriage exceeded guideline maintenance, the parties were living above their income. See *Sandberg v. Sandberg*, 11 Ill. App. 3d 495, 501 (1973) (noting that where the parties have lived during the marriage in such a way as to consume all of their income, or to have lived beyond their means, the payee spouse should not necessarily be furnished with funds after divorce to maintain the scale of living to which he or she was accustomed before the breakdown of the marriage).

¶ 89    Additionally, the trial court considered other factors set forth in section 504(a). The court

noted that the parties were married for more than 22 years, that respondent was 48 years old, and that respondent lacked a college degree. The court noted that respondent's primary occupation during the marriage was as a homemaker and the principal caretaker of the children. The court found that respondent may have a difficult time finding employment given her age, lack of an undergraduate degree, and the time she spent out of the workforce raising her children. Nevertheless, given that respondent attended three years of college, had marketing experience working for petitioner at ConopCo, and had run a profitable business, the court found that she had marketable skills and could find work if she desired to work. As the foregoing suggests, the trial court addressed all of the points respondent raises on appeal. Nothing in respondent's argument persuades us that the trial court's decision to award guideline maintenance was arbitrary or fanciful or that no reasonable person would agree with the court's position. Accordingly, we conclude that the trial court's award of guideline maintenance did not constitute an abuse of discretion.

¶ 90                                    (2). Child Support

¶ 91       Pursuant to section 505(a)(1) of the Act (750 ILCS 5/505(a)(1) (West 2018)), the Illinois Department of Healthcare and Family Services established a schedule of basic support obligations. Section 505(a)(1.5) (750 ILCS 5/505(a)(1.5) (West 2018)) provides that the court "shall" compute the basic child-support obligation by (1) determining each parent's monthly net income, (2) adding the parents' net monthly incomes together to determine their combined net monthly income, (3) selecting the corresponding appropriate amount from the schedule of basic child-support obligations based on the parties' combined net monthly income and their number of children, and (4) calculating each parent's percentage share of the basic support obligation.

¶ 92       The court must apply the guidelines unless the court makes a finding that application of the guidelines would be inappropriate, after considering the best interests of the child and evidence

which shows relevant factors, including, but not limited to, one or more of the following: (1) the financial resources and needs of the child; (2) the financial needs and resources of the parents; (3) the standard of living that the child would have enjoyed had the marriage not been dissolved; and (4) the physical and emotional condition of the child and his or her educational needs. 750 ILCS 5/505(a)(2) (West 2018). There is a rebuttable presumption that the amount of the child-support obligation that results from application of the guidelines is the correct amount of child support. 750 ILCS 5/505(a)(3.3) (West 2018). The proponent of a deviation from the guidelines has the burden of producing evidence that compelling reasons exist to justify the deviation. *People ex rel. Department of Healthcare & Family Services v. Chakona*, 2020 IL App (2d) 190918, ¶ 17; *In re Marriage of Hill*, 2015 IL App (2d) 140345, ¶ 29. Any deviation from the guidelines shall be accompanied by the court's written findings specifying the reasons for the deviation and the presumed amount without a deviation. 750 ILCS 5/505(a)(3.4) (West 2018). Those reasons may include: (1) extraordinary medical expenditures necessary to preserve the life or health of a child of either or both of the parties; (2) additional expenses incurred for a child subject to the child-support order who has special medical, physical, or developmental needs; and (3) any other factor the court determines should be applied upon a finding that the application of the child-support guidelines would be inappropriate, after considering the best interests of the child. 750 ILCS 5/505(a)(3.4) (West 2018). A decision to deviate from guideline child support is reviewed for an abuse of discretion. *People ex rel. Department of Healthcare & Family Services*, 2020 IL App (2d) 190918, ¶ 19.

¶ 93    Respondent argues that the trial court erred in failing to find that she rebutted the presumption that the amount of petitioner's child-support obligation that would result from an application of the child-support guidelines was correct and that their application here would result

in an unjust support award. Respondent further argues that the court erred in failing to find that application of the guidelines would be inappropriate, after considering the best interests of the children and the evidence of their lifestyle needs, petitioner's financial resources and ability to pay them, and the historical lifestyle that the children enjoyed during the marriage, including "living in a luxurious $2 million home in Lake Forest, a summer home in Union Pier, Michigan, [and] taking private tennis lessons."

¶ 94    Again, nothing in respondent's argument persuades us that the trial court's decision to award guideline child support was arbitrary or fanciful, or that no reasonable person would agree with the court's position, which is the standard we must apply in assessing the trial court's decision. Respondent provided no "compelling" evidence for a deviation from guideline child support. Respondent does not claim that the children have extraordinary medical expenditures or special medical, physical, or developmental needs. Instead, she essentially relies on a claim that the parties had two homes and the children attended private tennis lessons. However, as noted above, the trial court found that the parties presented very little testimony about their lifestyle prior to the breakdown of the marriage. Further, the court found that the evidence that was presented showed that the parties were living above their income. Given this record and findings, the trial court could have reasonably concluded that the parties would not have been able to sustain the lifestyle they had been living and, in turn, that the homes they had and private tennis lessons would not have been representative of the standard of living that the children would have enjoyed had the marriage not been dissolved. Accordingly, we conclude that the trial court's award of guideline child support did not constitute an abuse of discretion.

¶ 95                    2. Petitioner's Arguments

¶ 96    Petitioner argues that the trial court erred in calculating his income for purposes of

maintenance and child support. Petitioner's contentions in this regard are twofold. First, he asserts that the trial court erred by ignoring evidence of his 2017 and 2018 income. Second, petitioner maintains that the trial court made mathematical errors in computing his annual income and that the court compounded the mathematical errors by including income that either belonged to respondent or that he no longer receives.

¶ 97    As noted above, as a prerequisite to determining the amount of guideline maintenance, the trial court must determine the parties' gross and net annual incomes. 750 ILCS 5/504(b-1)(1)(A), (b-3), (b-3.5) (West 2018); 750 ILCS 5/505(a)(3)(A), (B) (West 2018). Credibility and forthrightness of the obligor in disclosing his or her income is a factor for the court to consider when determining a party's income for support purposes. *In re Marriage of Gabriel*, 2020 IL App (1st) 182710, ¶ 42; *In re Marriage of Karonis*, 296 Ill. App. 3d 86, 92 (1998); *In re Parentage of Janssen*, 292 Ill. App. 3d 219, 224 (1997). If net income is difficult to ascertain or uncertain, a court may consider past earnings. *Gabriel*, 2020 IL App (1st) 182710, ¶ 40; *Karonis*, 296 Ill. App. 3d 86, 92 (1998); *In re Marriage of Morse*, 240 Ill. App. 3d 296, 309 (1993). Moreover, where the payor spouse's income fluctuates from year to year, the trial court may average the income over several years to determine a support obligation. See *In re Marriage of Garrett*, 336 Ill. App. 3d 1018, 1024-25 (2003); *In re Marriage of Freesen*, 275 Ill. App. 3d 97, 103 (1995). As noted, the trial court's factual findings regarding support, such as the determination of a party's income, will be set aside only if those findings are against the manifest weight of the evidence. *Brill*, 2017 IL App (2d) 160604, ¶ 30; *Moorthy*, 2015 IL App (1st) 132077, ¶ 41; *In re Marriage of Wojcik*, 362 Ill. App. 3d 144, 153 (2005). However, the decision to award maintenance is reviewed for an abuse of discretion. *Schneider*, 214 Ill. 2d at 173; *Moorthy*, 2015 IL App (1st) 132077, ¶ 41.

¶ 98                              a. Evidence of 2017 and 2018 Income

¶ 99    Petitioner first argues that the trial court erred in calculating his annual gross income by averaging the total income set forth on the parties' joint 2014, 2015, and 2016 federal income tax returns. According to petitioner, the trial court's methodology ignored evidence of a reduction in his income in 2017 and 2018, the two years closest to the date of the amended judgment of dissolution of marriage, and resulted in an income determination based on information that was "stale" and "out of date."

¶ 100    The trial court calculated petitioner's annual gross income by averaging the total income set forth on the parties' joint 2014, 2015, and 2016 federal income tax returns after concluding that petitioner's current income was difficult to ascertain due to petitioner's lack of credibility regarding the amount of his annual salary after 2016. Specifically, the court found that the parties' 2017 and 2018 tax returns offered into evidence were "unreliable." In this regard, the court found that the 2018 return was prepared for trial on a preliminary basis with incomplete data. Additionally, the court found "credible evidence" that petitioner had manipulated ConopCo's books to make it appear that the business was in a "downward spiral." The court explained that although ConopCo's gross receipts remained steady between 2012 and 2018, petitioner knowingly inflated his business expenses in order to artificially decrease his salary in 2017 and 2018. As noted in relation to its credibility finding, the trial court cited numerous actions taken by petitioner in 2017 and 2018 that the court determined were inconsistent with petitioner's representation that ConopCo was operating in a "downward spiral."

¶ 101    As noted previously, we defer to the trial court on credibility issues because the trial court, by virtue of its ability to actually observe the conduct and demeanor of a witness, is in the best position to assess his or her credibility. *Cotton*, 103 Ill. 2d at 356; *Manker*, 375 Ill. App. 3d at 477. Given the evidence set forth above, the deferential standard of review we apply, and our prior

finding regarding petitioner's credibility, we simply cannot say that the trial court's factual determination that the parties' 2017 and 2018 tax returns were "unreliable" was against the manifest weight of the evidence. In turn, the trial court did not abuse its discretion in employing an income-averaging approach to determine petitioner's annual gross income. Although petitioner characterizes the figures reflected on the 2014 through 2016 tax returns as "stale" and "out of date," those tax returns were from the three years immediately preceding February 17, 2017, the date petitioner filed his petition for dissolution. As such, absent the 2017 and 2018 returns, they were the most recent *reliable* numbers with which the trial court had to work.

¶ 102   Petitioner takes issue with a number of the trial court's factual findings regarding his and ConopCo's financial circumstances at the time of the trial. For instance, petitioner asserts that the trial court mischaracterized evidence that he hosted an "expensive" holiday party. According to petitioner, the gathering was a "modest" affair and the total cost was only "a couple hundred bucks." At trial, petitioner testified that in 2018, he hosted a spa day with breakfast at the East Bank Club in Chicago followed by lunch at a restaurant on the Gold Cost for himself and five employees. When respondent's attorney questioned petitioner about the cost, he initially stated that he did not remember. He then stated the party cost "a couple hundred bucks." Upon further questioning, respondent's attorney asked if the party cost $4000, petitioner responded that he did not know. Given the description of the party, the number of attendees, and petitioner's equivocal testimony, the trial court could have reasonably concluded that petitioner's claim that the party cost "a couple hundred bucks" was not credible. As such, we cannot say that the trial court's findings that the holiday party was expensive and that it was inconsistent with petitioner's claim that ConopCo was in a downward spiral were against the manifest weight of the evidence.

¶ 103   Petitioner also takes issue with the trial court's findings regarding his employees'

compensation. While petitioner does not dispute that he continued to pay his employees significant annual bonuses and salaries or that he increased the wages he paid to his employees by more than $117,000 from 2016 to 2017, he argues that "a business has to pay its employees if it is to stay afloat." He also contends that, in criticizing him for continuing to pay Beecroft a full salary even though she was not working full time due to her illness, the trial court "conflated [his] conduct as a good, supportive employer with an unfounded implication that he was somehow benefitting from taking care of an employee." Again, we cannot conclude that the trial court's findings on these matters are against the manifest weight of the evidence. The trial court could reasonably find that petitioner's actions were inconsistent with his claim that ConopCo was in dire financial straits.

¶ 104   For all these reasons, we conclude that the trial court's factual findings regarding petitioner's income were not against the manifest weight of the evidence and that the court did not abuse its discretion in employing an income-averaging approach to determine petitioner's annual gross income for support purposes.

¶ 105                              b. Mathematical Errors

¶ 106   Petitioner argues that even if his average gross income between 2014 and 2016 is used as the basis for establishing his support obligations, we should reverse and remand the trial court's ruling because the trial court made several mathematical errors in computing his annual income and the court compounded the mathematical errors by including income that either belonged to respondent or that he no longer receives.

¶ 107   Respondent does not dispute that the trial court made mathematical errors in computing petitioner's average gross income from 2014 through 2016. She argues, however, that the errors are minimal and provide no basis to reverse the maintenance award. She also contends that petitioner failed to cite any authority in support of his argument regarding the trial court's

mathematical errors, so this argument should be deemed forfeited.

¶ 108   Initially, we reject respondent's forfeiture argument. In the section of his brief discussing the trial court's errors in calculating his income, petitioner cited *Wojcik*, 362 Ill. App. 3d at 153, for the proposition that the appellate court may set aside the trial court's findings regarding the parties' incomes if those findings are against the manifest weight of the evidence. Moreover, petitioner asserted that the court's mathematical errors were one of the bases to show that the trial court's findings were against the manifest weight of the evidence. Although petitioner's citation to authority was not extensive, we find that petitioner adequately set forth his contention of error "and the reasons therefor, with citation of the authorities and the pages of the record relied on." Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). We therefore turn to the merits.

¶ 109   We agree that the trial court made mathematical errors in calculating petitioner's average gross income from 2014 through 2016. In the amended judgment of dissolution, the trial court calculated petitioner's average gross income for the period from 2014 through 2016 as $362,981. The trial court purportedly made this determination based on the parties' joint federal income tax returns for 2014 through 2016. However, as petitioner points out, the actual numbers from the parties' tax returns show that their "total income" was $353,932 for 2014, $337,635 for 2015, and $376,245 for 2016.[2] Further, in 2016, the parties' reported tax-exempt interest of $2015 that is not

_____

[2] Part of the reason for the discrepancy is the fact that the trial court relied on a "schedule" of the parties' income tax returns prepared by respondent's counsel. That schedule is fraught with mathematical errors. Additionally, the schedule calculated total income to include both ordinary dividends and qualified dividends. That was improper as "qualified dividends" are a subset of "ordinary dividends." West's Tax Law Dictionary, § Q151 ("Qualified dividends are included in

included in the total income for that year. Dividing by three the sum of the parties' total income for these three years and the tax-exempt interest yields an average gross income of $356,609.[3] See 750 ILCS 5/505(a)(3)(A) (West 2018) (defining "gross income" for support purposes as "the total of all income from all sources"); 750 ILCS 5/504(b-3) (West 2018) (same); *In re Marriage of Rogers*, 213 Ill. 2d 129, 137 (2004) (noting that because the Internal Revenue Code was designed to achieve different purposes than the support provisions of the Act, "income" for purposes of a support obligation includes a variety of payments that would not be taxable as income under the Internal Revenue Code). Therefore, based solely on the parties' total income as reported on their tax returns, the trial court's finding is more than $6000 higher than the correct average gross income for the three-year period.

¶ 110    Petitioner further argues that the trial court erred in including in its calculation of his gross income for 2014 through 2016 (1) respondent's income from her business, Never Before Baskets, and (2) income from sources that petitioner no longer receives. In this regard, petitioner notes that the parties' tax returns reflect that the parties' received $2655 in income from Never Before Baskets in 2014, $2415 in income from Never Before Baskets in 2015, and $3126 in income from Never Before Baskets in 2016. Petitioner further notes that in 2015 and 2016, the parties reported income from various bank accounts, investments, and other assets which were divided by the trial court in the amended judgment of dissolution, with respondent receiving 60% of the value of the assets and petitioner receiving 40% of the assets.

---

ordinary dividends"); see also irs.gov/instructions/i1099div (last visited on July 14, 2022) (stating that "qualified dividends" are a "portion" of "total ordinary dividends").

[3] $353,932 + $337,635 + $376,245 + $2015=$1,069,827 and $1,069,827/3=$356,609.

¶ 111   We agree that the trial court erred in including in its calculation of petitioner's gross income for 2014 through 2016 respondent's business income. Under the Act, a guideline maintenance award is calculated by taking 33-1/3% of the payor's net income and subtracting 25% of the payee's net annual income. 750 ILCS 5/504(b-1)(1)(A) (West 2018). A parent's share of the guideline child-support award is calculated by determining the parents' combined monthly net income and calculating each parent's share of the basic child-support obligation based on the parent's percentage share of the combined monthly net income. 750 ILCS 5/505(a)(1.5) (West 2018); *In re Marriage of Salvatore*, 2019 IL App (2d) 180425, ¶ 18. Thus, to the extent that the trial court calculated petitioner's average gross income by including respondent's business income, this was improper.[4]   Indeed, other than argue that the amounts she earned from Never Before Baskets were minimal, respondent does dispute that it was improper for the trial court to include income from her business in petitioner's average gross income.

¶ 112   We also agree that, in calculating petitioner's gross income for support, the trial court erroneously included income from assets that were awarded to respondent. As petitioner notes, in 2015 and 2016, the parties reported income from various bank accounts, investments, and other assets. These assets were ultimately divided by the trial court in the amended judgment of dissolution, with respondent receiving 60% of the value of the assets and petitioner receiving 40%

---

[4] Parenthetically, we note that in calculating petitioner's average gross income from 2014 through 2016, the trial court assigned to petitioner the wages ConopCo paid to respondent during this time period. In support of this finding, the court reasoned that petitioner never told respondent that she was an "employee" of ConopCo and he did not provide her with a paycheck and access to her "wages." Petitioner does not challenge this finding on appeal.

of the assets. Thus, certain assets awarded to *respondent* in an equitable distribution of marital property were also considered as a source of income to *petitioner* for purposes of imposing support obligations. This resulted in "double dipping" and was improper. See *In re Marriage of O'Malley*, 2021 IL App (2d) 190917-U, ¶ 66; see also *In re Marriage of Eberhardt*, 387 Ill. App. 3d 226, 232 (2008) (discussing the concept of "double dipping").

¶ 113    As noted, respondent argues that the errors are minimal and do not provide a basis to reverse the support obligations. In support of this claim, respondent cites *In re Marriage of Lindsey-Robinson*, 331 Ill. App. 3d 261 (2002). At issue in that case was the division of the marital portion of the husband's pension plan. The parties stipulated that the value of the plan as $92,318. The trial court ordered that the stipulated marital portion of the pension plan be divided equally between the parties. Thus, each party should have received $46,159 of the stipulated marital portion of the pension plan ($92,318 divided by 2). However, the qualified domestic relations order directed the pension plan to pay the wife $46,151, or $8 less than the trial court's order. The trial court found this difference to be *de minimis* and therefore a remand to correct it unnecessary. *Lindsey-Robinson*, 331 Ill. App. 3d 261, 267 (2002).

¶ 114    We find respondent's reliance on *Lindsey-Robinson* unpersuasive. The error involved in that case was a one-time error amounting to 0.017% of the correct value of each party's portion of the pension plan ($8 divided by $46,159). Even by respondent's calculations, the errors identified by petitioner were much greater, ranging from 0.3% to 1.8% individually. Moreover, given the quantity of errors involved as well as the duration of the support obligations imposed in this case, we are unable to conclude that the errors were *de minimis*. Accordingly, we remand the matter to the trial court to recalculate petitioner's average gross income for 2014 through 2016 and to recalculate his support obligations based on the corrected number. On remand, the court shall

calculate petitioner's average gross income for the three-year period from 2014 through 2016 based on the parties' federal income tax returns for that period, but excluding respondent's income from her business and any income included in those returns that petitioner no longer receives as a result of the division of marital assets.

¶ 115                                  D. Amount of Income Imputed to Respondent

¶ 116   Next, petitioner argues that the trial court did not impute the proper amount of income to respondent for purposes of calculating maintenance and child support. According to petitioner, the "uncontroverted evidence" presented at trial showed that respondent's earning ability is much greater than the $40,000 per year imputed by the trial court. As such, petitioner urges this court to remand the issue to the trial court with instructions to impute a reasonable amount of income to respondent and to recalculate his maintenance and child-support obligations incorporating respondent's corrected imputed income amount.

¶ 117   In setting a support obligation, the trial court has the authority to impute income to either the payor or payee spouse if one or both of the parties does not make a good-faith effort to earn a sufficient income. *In re Marriage of Liszka*, 2016 IL App (3d) 150238, ¶ 45; see also *In re Marriage of Ruvola*, 2017 IL App (2d) 160737, ¶¶ 23-46 (payee spouse); *Blume*, 2016 IL App (3d) 140276, ¶¶ 27-31 (payor spouse); *In re Marriage of S.D.*, 2012 IL App (1st) 101876, ¶¶ 35-37 (payee spouse). The amount of income to impute is based on the party's earning capacity and must be supported by evidence showing that it is commensurate with the party's skills and experience, not mere speculation. *Liszka*, 2016 IL App (3d) 150238, ¶ 46. Among the factors a court should examine in determining the amount of income to impute are: (1) the work and earnings history of the spouse; (2) the spouse's educational background; (3) the spouse's occupational qualifications; and (4) prevailing job opportunities in the geographic area. *Liszka*, 2016 IL App (3d) 150238, ¶ 45.

We review a trial court's decision to impute income for an abuse of discretion. *Ruvola*, 2017 IL App (2d) 160737, ¶ 39; *In re Marriage of Gosney*, 394 Ill. App. 3d 1073, 1077 (2009). A trial court abuses its discretion only where no reasonable person would take the view adopted by the court. *Ruvola*, 2017 IL App (2d) 160737, ¶ 39. However, we review a challenge to the trial court's factual findings relative to the imputation of income under the manifest weight of the evidence standard. See *Brill*, 2017 IL App (2d) 160604, ¶ 30; *Wojcik*, 362 Ill. App. 3d 144, 153 (2005). Findings are against the manifest weight of the evidence only when an opposite conclusion is clearly evident or when the court's findings are unreasonable, arbitrary, or not based on the evidence. *Romano*, 2012 IL App (2d) 091339, ¶ 44.

¶ 118   Applying the foregoing standards to the facts before us, we conclude that the trial court did not err in imputing income of $40,000 per year to respondent for purposes of calculating petitioner's support obligations. In the amended judgment of dissolution of marriage, the trial court, noting that respondent attended college, had marketing experience working for ConopCo, and had a proven ability to run a business, concluded that respondent possessed marketable skills and could find work if she desired to do so. The court went on to find that neither party presented any credible evidence regarding the amount respondent could reasonably earn in the job market. In this regard, the court noted that despite a court order requiring her to conduct a job search and document her progress, respondent had not been diligent in seeking employment as she applied for positions for which she was unlikely to be hired. The court acknowledged petitioner's testimony that he believed respondent could earn between $75,000 and $150,000 based on what he would pay someone in the marketing field. The court attributed little weight to petitioner's testimony, however, on the bases that petitioner is not a vocational expert, his opinion was "highly subjective," and neither party testified as to the specific hours respondent spent working for

ConopCo. Accordingly, the court examined evidence relative to respondent's work and earnings history, educational background, and occupational qualifications. The court observed that although respondent attended college, she lacked an undergraduate degree. The court also observed that respondent's job search may be made more difficult in light of her age, the time she spent out of the workforce to raise the parties' daughters, and the fact that her most recent "employer" was her husband in the family business. Nevertheless, given the fact that respondent did attend three years of college, possessed marketing experience through her work at ConopCo, and had a proven ability to earn between $35,000 and $45,000 running her own business, the court imputed an income to respondent in the amount of $40,000 per year. Based on our review of this record, we cannot say that the trial court's factual findings are against the manifest weight of the evidence or that its ultimate decision to impute $40,000 per year to respondent constituted an abuse of discretion.

¶ 119  Petitioner disputes the trial court's finding on several grounds. First, petitioner argues that the trial court erred in rejecting his testimony that respondent could earn between $75,000 and $150,000 per year working full time. According to petitioner, his "uncontroverted testimony" was the only evidence the trial court heard regarding respondent's earning ability at the time of dissolution. As noted above, however, the trial court found that neither party presented *credible* testimony as to the amount respondent could reasonably earn in the current job market. In rejecting petitioner's testimony regarding respondent's earning ability, the court cited the fact that petitioner is not a vocational expert, his opinion was "highly subjective," and neither party testified as to the specific hours respondent spent working for ConopCo. As noted previously, questions of witness credibility as well as the weight to assign to a witness's testimony are inherently matters for the trier of fact to resolve and will not be disturbed unless the findings are against the manifest weight of the evidence. *Sturm*, 2012 IL App (4th) 110559, ¶ 6; *Manker*, 375 Ill. App. 3d at 477. Given the

deference we afford the trial court on such matters and in light of the court's cogent rationale, we cannot say that the trial court's decision to reject petitioner's testimony regarding respondent's earning capacity was against the manifest weight of the evidence.

¶ 120   Second, petitioner asserts that the evidence presented at trial establishes that respondent could earn at least $55,000 per year. In support of this claim, petitioner notes that in 2015 and 2016, respondent earned an annual salary of $64,800 and $55,000, respectively, while working part time at ConopCo doing marketing, graphic design, mailings, and client lists. As the trial court noted, however, ConopCo was her husband's business and neither party testified as to the specific hours or time respondent worked for ConopCo. Thus, the trial court could have reasonably concluded that respondent's wage at ConopCo was not a valid gauge of her earning capacity at a non-family business. Moreover, respondent testified that she was not even aware that petitioner was compensating her for the work she did at ConopCo. The trial court found respondent's testimony on this point credible. Petitioner also notes that after respondent stopped working for ConopCo, the company temporarily hired his sister to help with marketing and other tasks, paying her $50,000 in compensation. The court then hired Fischer, a woman with very little experience in marketing, at a salary of $55,000 per year. Again, the trial court could reasonably reject this evidence as a valid gauge of respondent's earning capacity as there was little evidence regarding the hours or time Franck or Fischer spent working for ConopCo, their work or earnings history, or their educational and work backgrounds.

¶ 121   Petitioner also contends that respondent offered no evidence regarding her own current earning capacity. Petitioner asserts that the only information respondent provided to the trial court was her testimony that the most she had earned running her business was between $35,000 and $40,000 in 2004, approximately 15 years prior to her trial testimony. Petitioner argues that it was

improper for the trial court to base its income calculation "on outdated data that no longer reflect prospective income." See *In re Marriage of Hoveln*, 2018 IL App (4th) 180112, ¶ 40. However, Illinois courts have considered an individual's past income when current income is uncertain. *In re Marriage of Van Ness*, 136 Ill. App. 3d 185, 190 (1985). As noted, the trial court specifically found that neither party presented credible testimony as to the amount respondent could reasonably earn in the job market today. That finding was not against the manifest weight of the evidence. Accordingly, the trial court did not err in relying on respondent's testimony as to her past income.

¶ 122 Finally, petitioner claims that an adjustment for inflation of the $40,000 respondent earned in 2004 would yield close to $55,000 in today's dollars. However, petitioner did not present this argument to the trial court and he does not explain how he calculated this figure. Therefore, we reject this argument as forfeited. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

¶ 123 In short, we conclude that the trial court did not err in imputing income of $40,000 per year to respondent for purposes of calculating respondent's maintenance and child-support obligations.

¶ 124                    E. Allocation of Medical Insurance Cost

¶ 125 Next, petitioner challenges the trial court's ruling with respect to the allocation of medical insurance costs for the parties' children. The amended judgment of dissolution of marriage provides that petitioner "shall be solely responsible for the cost of the children's health insurance premiums without contribution by [respondent]." Petitioner argues that the trial court's ruling is contrary to the requirements of sections 505(a)(4)(D) and 505(a)(4)(E) of the Act (750 ILCS 5/504(a)(4)(D), (E) (West 2018)), which require the cost of health insurance premiums to "be allocated between the parents in proportion to their respective net incomes." As such, petitioner asserts that the provision of the amended judgment of dissolution of marriage that makes him solely responsible for the cost of the children's health insurance premiums should be reversed and

the cause remanded to the trial court with instructions to allocate the cost of the health insurance premiums between the parties as required by the Act.

¶ 126 Respondent answers that the trial court did not err in making petitioner solely responsible for the cost of the children's health insurance premiums because, pursuant to section 505(a)(4)(A) of the Act (750 ILCS 5/505(a)(4)(A) (West 2018)), the allocation of the cost of the children's medical insurance premiums between the parents is discretionary. Alternatively, respondent contends that the trial court's failure to allocate the cost of the children's medical insurance premiums between the parties in proportion to their respective net incomes resulted in a *de minimis* error and therefore provides no basis to reverse the trial court's decision regarding the cost of the children's health insurance premiums.

¶ 127 Whether the Act requires the allocation of the cost of the children's health insurance premiums in proportion to the parents' net incomes is a question of statutory construction. As noted earlier, the primary objective of statutory construction is to ascertain and give effect to the intent of the legislature. *State Bank of Cherry*, 2013 IL 113836, ¶ 56. The most reliable indicator of legislative intent is the language of the statute itself, given its plain and ordinary meaning. *State Bank of Cherry*, 2013 IL 113836, ¶ 56. The statute must be read in its entirety and construed so as to give effect to every word, clause, and sentence. *Palm v. Holocker*, 2018 IL 123152, ¶ 21. If the statutory language is clear and unambiguous, it must be applied as written, without resorting to further aids of statutory construction. *State Bank of Cherry*, 2013 IL 113836, ¶ 56. A court may not depart from the plain language of the statute and read into it exceptions, limitation, or conditions that are not consistent with the express legislative intent. *State Bank of Cherry*, 2013 IL 113836, ¶ 56. Issues of statutory construction are subject to *de novo* review. *Carstens*, 2018 IL App (2d) 170183, ¶ 28.

¶ 128  The allocation of a child's health insurance premium is governed by section 505(a)(4) of the Act (750 ILCS 5/505(a)(4) (West 2018)). That provision states in relevant part as follows:

"(a) In a proceeding for dissolution of marriage ***, the court may order either or both parents owing a duty of support to a child of the marriage *** to pay an amount reasonable and necessary for support.

* * *

(4) Health care.

(A) A portion of the basic child support obligation is intended to cover basic ordinary out-of-pocket medical expenses. The court, in its discretion, in addition to the basic child support obligation, shall also provide for the child's current and future medical needs by ordering either or both parents to initiate health insurance coverage for the child through currently effective health insurance policies held by the parent or parents, purchase one or more or all health, dental, or vision insurance policies for the child, or provide for the child's current and future medical needs through some other manner.

* * *

(D) The amount to be added to the basic child support obligation shall be the actual amount of the total health insurance premium that is attributable to the child who is the subject of the order. If this amount is not available or cannot be verified, the total cost of the health insurance premium shall be divided by the total number of persons covered by the policy. The cost per person derived from this calculation shall be multiplied by the number of children who are the subject of the order and who are covered under the health insurance policy. This amount shall be added to the basic child support obligation and shall be allocated between the parents in proportion to their respective net incomes.

(E) After the health insurance premium for the child is added to the basic child support obligation and allocated between the parents in proportion to their respective incomes for child support purposes, if the obligor is paying the premium, the amount calculated for the obligee's share of the health insurance premium for the child shall be deducted from the obligor's share of the total child support obligation. If the obligee is paying for private health insurance for the child, the child support obligation shall be increased by the obligor's share of the premium payment. The obligor's and obligee's portion of the health insurance costs shall appear in the support order." 750 ILCS 5/505(a)(4)(A), (D), (E) (West 2018).

¶ 129 Applying the rules of statutory construction to the statutory language at issue, we agree with petitioner that the trial court erred in failing to allocate the cost of maintaining health insurance for the parties' children in proportion to the parties' respective net incomes. Section 505(a)(4)(D) states that the cost of the total health insurance premium that is attributable to the parties' children "*shall* be added to the basic child support obligation and *shall* be allocated between the parents in proportion to their respective net incomes." (Emphasis added.) (750 ILCS 5/504(a)(4)(D) (West 2018)). "Legislative use of the word 'may' is generally regarded as indicating a permissive or directory reading, whereas the use of the word 'shall' is generally considered to express a mandatory reading." *People v. Reed*, 177 Ill. 2d 389, 393 (1997); *Sunnyside Elgin Apartments, LLC v. Miller*, 2021 IL App (2d) 200614, ¶ 25. Thus, the legislature's use of the word "shall" in section 505(a)(4)(D) constitutes a clear expression that it intended to impose a mandatory obligation, *i.e.*, it meant for parents to share the cost of health insurance for their children. Had the legislature intended the allocation of the cost of maintaining health insurance for the parties' children to be permissive, it could have used the word "may." It did not. As such, we

conclude that the trial court erred in failing to allocate the cost of maintaining health insurance for the parties' children in proportion to their respective net incomes.

¶ 130    Respondent concedes that, when used in a statute, the term " 'shall' is generally considered to express a mandatory reading." Nevertheless, respondent maintains that the statute does not mandate that the cost of health insurance be allocated between the parties in proportion to their respective net incomes in all instances. Instead, relying on section 505(a)(4)(A) of the Act (750 ILCS 5/504(a)(4)(A) (West 2018)), respondent asserts that the statute only requires that the cost of health insurance be allocated between the parties in proportion to their respective net incomes "in the event that the court, in its discretion, orders both parents to share in that expense." Respondent therefore insists that the trial court "was absolutely authorized to require [petitioner], who was unquestionably the more financially advantaged spouse, to cover 100% of the costs of the minor children's insurance in total." We disagree.

¶ 131    Respondent focuses on the wrong part of the statute. Notably, section 505(a)(4)(A), which forms the basis for respondent's argument that the trial court had discretion to assign 100% of the children's health insurance premium to petitioner, relates to *initiating* health insurance coverage for the children, either utilizing existing policies or obtaining separate coverage. Whether the court had discretionary authority to order either or both parties to *initiate* health insurance coverage for the children was not at issue. The record clearly established that petitioner has health insurance coverage and he was ordered to continue to maintain health insurance coverage for the children in the amended judgment of dissolution of marriage. Thus, although section 505(a)(4)(A) addresses the trial court's discretion, that provision does *not* address the question of financial responsibility for the cost of the children's health insurance premium. Thus, respondent's reliance on section 505(a)(4)(A) is misplaced.

¶ 132 Alternatively, respondent contends that the trial court's decision not to allocate the cost of the children's health insurance premiums between the parties in this case resulted in a *de minimis* error and does not warrant a reversal of the trial court's order. According to respondent, if the trial court had allocated the children's health insurance premiums between the parties in proportion to their respective net incomes, she would have been required to pay 14% of the premium (based on the $40,000 in yearly income imputed to her) and respondent would have been required to pay 86% of the premium (based on the trial court's finding that petitioner's net annual income for purposes of calculating maintenance and child support is $249,288).[5] In that event, respondent calculates that her share of the premium would have been $103.71 per month and petitioner's share of the premium would have been $637.09 per month.[6] Respondent therefore concludes that, even assuming that petitioner's construction of section 505(a)(4) of the Act was correct, the error was *de minimis* because it required him to contribute only $103.71 more towards the children's health insurance premium than he should have been required to pay. As such, respondent asserts that the fact that petitioner was required to bear the entire cost of the children's medical insurance premiums did not constitute an abuse of the trial court's discretions under the circumstances. Even if this amount might be considered *de minimis*, in the interests of fairness, we remand to the trial

---

[5] According to respondent, the $40,000 of imputed income was her "net income" since (1) she was unemployed and reported no employment income on her federal and state taxes returns and (2) she was not required to pay any income taxes.

[6] Respondent bases this calculation on the cost of the medical insurance premiums being $370.40 per child (or $740.80 per month for both children) as reflected in petitioner's December 31, 2018, financial affidavit.

court for reallocation with instructions to allocate the cost of the health insurance premiums between the parties in proportion to their respective net incomes (750 ILCS 5/505(a)(4)(D), (E) (West 2018)) since we are remanding the matter for other purposes as well.

¶ 133                              F. Contribution to Attorney Fees

¶ 134   Finally, we address a contention raised in both parties' appeals—that the trial court erred in failing to order contribution to the other party's legal fees and costs.

¶ 135   Generally, each party is responsible for his or her attorney fees. *In re Marriage of Mantei*, 222 Ill. App. 3d 933, 941 (1991). However, under section 508(a) of the Act, the trial court may order a party to contribute a reasonable amount for the opposing party's attorney fees. 750 ILCS 5/508(a) (West 2018). In determining whether a contribution award is appropriate, the trial court must consider the financial resources of the parties. 750 ILCS 5/508(a) (West 2018). This inquiry is dependent upon a showing by the party seeking the fees of an inability to pay and a demonstration of the ability of the other spouse to do so. *Schneider*, 214 Ill. 2d at 174; *In re Marriage of Shen*, 2015 IL App (1st) 130733, ¶¶ 102-103; *In re Marriage of McGuire*, 305 Ill. App. 3d 474, 479 (1999). Financial inability exists where requiring payment of fees would strip that party of his or her means of support and undermine his or her financial stability. *Schneider*, 214 Ill. 2d at 174; *In re Marriage of Lonvick*, 2013 IL App (2d) 120865, ¶ 60. A contribution award is based on the criteria for the division of marital property and, where maintenance has been awarded, the criteria for an award of maintenance. 750 ILCS 5/503(d), 503(j)(2), 504(a), 508(a) (West 2018). These criteria include the property awarded to each spouse, a party's contribution as a homemaker, the parties' incomes, the parties' present and future earning capacity, and "any other factor the court expressly finds to be just and equitable." 750 ILCS 5/503(d), 504(a) (West 2018). Among the "other factors" that a court may consider when making an award of attorney fees is

whether a party unnecessarily increased the cost of litigation. *In re Marriage of Patel*, 2013 IL App (1st) 112571, ¶ 117; *In re Marriage of Bradley*, 2011 IL App (4th) 110392, ¶ 32; *In re Marriage of Haken*, 394 Ill. App. 3d 155, 161 (2009). Further, in making a contribution award, the trial court must also consider whether the attorney fees charged are reasonable. 750 ILCS 5/508(a) (West 2018); *In re Marriage of Hasabnis*, 322 Ill. App. 3d 582, 596 (2001).

¶ 136   Additionally, section 508(b) of the Act (750 ILCS 5/508(b) (West 2018)) requires the trial court to order one party to pay the other party's reasonable attorney fees under certain circumstances. Relevant here, section 508(b) mandates the assessment of costs and attorney fees when the court finds that a hearing was "precipitated or conducted for any improper purpose," including but not limited to, "harassment, unnecessary delay, or other acts needlessly increasing the cost of litigation." 750 ILCS 5/508(b) (West 2018). An award under section 508(b) does not depend on a party's inability to pay the fees or the other party's ability to pay. *In re Marriage of Walters*, 238 Ill. App. 3d 1086, 1098 (1992). The fee award is, however, subject to a determination of reasonableness. *Walters*, 238 Ill. App. 3d at 1098.

¶ 137   We review a trial court's ruling on a party's request for contribution to attorney fees for an abuse of discretion. *In re Marriage of Micheli*, 2014 IL App (2d) 121245, ¶ 45; *In re Marriage of Michaelson*, 359 Ill. App. 3d 706, 715 (2005). Abuse of discretion is "the most deferential standard of review—next to no review at all." *In re Marriage of Vancura*, 356 Ill. App. 3d 200, 204 (2005). Under this standard, we will reverse only if the trial court's decision is arbitrary, fanciful, or unreasonable, or no reasonable person would take the view adopted by the trial court. *In re Marriage of Andres*, 2021 IL App (2d) 191146, ¶ 76.

¶ 138                          1. The Trial Court's Ruling

¶ 139   In ruling on the parties' petitions, the trial court initially addressed the reasonableness of

the fees assessed by the parties' attorneys. The court noted that petitioner had been represented by Michael Sabath of Berger Schatz for the entirety of the proceedings. The court found that petitioner incurred $325,890.62 in attorney fees and costs as of the time of the contribution hearing. Of that amount, $249,949.30 had been paid on petitioner's behalf, leaving a balance due of $75,941.32. The court found the fees assessed by petitioner's counsel to be reasonable and necessary. The trial court found that respondent had incurred a combined total of $1,062,265.72 in fees to three separate law firms as of the time of the contribution hearing. Of that amount, $848,225.16 in attorney fees and costs of litigation were incurred in connection with services rendered by Grund of Grund & Leavitt, who represented respondent at trial. The court noted that Grund had voluntarily written off $398,837.50 in fees and that $205,000 had been paid by petitioner or on her behalf, leaving a balance due to her current counsel of $244,387.66. The court found these fees to be reasonable and necessary in light of counsel's voluntary fee reduction.

¶ 140   The court then turned to the issue of contribution, ruling as follows:

"The Court finds that after considering the evidence presented and the criteria and factors of Sections 503(j) and 508(b) of the [Act (750 ILCS 5/503(j), 508(b) (West 2018))], neither party is entitled to contribution for their attorneys fees and that both parties shall be responsible for their own attorneys fees. Both parties chose a scorched-earth method of litigation. Both parties fought (and *continue* to fight) over every aspect of this litigation, to the detriment of the marital estate. Both parties lack cooperation and communication; both parties lack insight as to their personal responsibility in aggravating and extending this litigation; both parties unnecessarily increased the cost of litigation; and the conduct of both parties increased the amount of attorney fees. Through the course of this litigation, [respondent] has retained three separate law firms. Her third and final choice is a law firm

where the billing partner charges for time at $750 per hour. She chose not to compromise at any point in the litigation. At the contribution hearing, her attorney testified that he advised [respondent] not to accept the Court's settlement recommendations and the offers made in mediation and instead counseled her regarding foreclosure and bankruptcy." (Emphasis in original.)

The court then quoted the following passage from *Mantei*, 222 Ill. App. 3d at 941:

"A party cannot enter into such a battle and expect to come out unscathed. While we recognize the purpose of the statute *** so that concerns about incurring large attorney fees will not coerce a litigant into conceding meritorious claims, it is an unreasonable expectation to anticipate that the trial court will automatically require the other party to pay such attorney fees regardless of one's conduct during the litigation. There are times when the failure to compromise is frivolous."

¶ 141                                    2. Respondent's Argument

¶ 142   Respondent argues that the trial court abused its discretion in denying her claim for contribution to her attorney fees and costs from petitioner. Relying on section 503(j) of the Act (750 ILCS 5/503(j) (West 2018)), and considering the criteria for the division of marital property under section 503(d) of the Act (750 ILCS 5/503(d) (West 2018)) and for maintenance under section 504(a) of the Act (750 ILCS 5/504(a) (West 2018)), respondent contends that the trial court's ruling constituted an abuse of discretion because it "left her in an extremely precarious financial situation, if not bankrupt, and completely undermined her financial stability and security." In support of this position, respondent claims she was awarded "meagre" liquid assets valued at $180,294.18 in the aggregate and has no sources of income other than the $6123.75 per month in maintenance that she was awarded. Additionally, noting that she is now 50 years old, has

a limited work history, and forewent training, employment, and career opportunities to serve as a full-time homemaker and caregiver to the parties' children, respondent suggests that her present and future earning capacity are poor. In contrast, respondent maintains that petitioner's financial circumstances are superior to hers and that he can easily afford to contribute to her attorney fees and costs. Respondent also asserts that petitioner was "overtly litigious," having filed 59 motions throughout the trial, the majority of which were either denied or abandoned, and that petitioner engaged in a " 'scorched-earth' approach to deplete the marital estate and to financially cripple her."

¶ 143    Petitioner responds that the trial court correctly declined to award respondent any contribution to her attorney fees. Petitioner asserts that respondent filed at least 58 motions or pleadings in the underlying case, thereby engaging in "unnecessary and expensive litigation" and "draining the value of the marital estate." Petitioner further asserts that while respondent's claim that she is unable to pay her attorney fees "seems compelling," the record shows that he is also unable to pay respondent's fees. In this regard, petitioner observes that he was awarded a smaller percentage of the liquid assets, the real estate he was awarded is underwater, and his income is insufficient to cover his living expenses. Petitioner therefore submits that, given the facts of the case, including respondent's conduct during the litigation that both drained the marital estate and ran up both parties' attorney fees, the trial court did not abuse its discretion in refusing to award respondent contribution to her attorney fees from him.

¶ 144    At the outset, we note that the trial court's decision to deny the parties' requests for contribution was based on "the criteria and factors of Sections 503(j) and 508(b)." Thus, the court's ruling was based on multiple, independent grounds. On appeal, respondent does not expressly reference section 508(b) or the trial court's ruling with respect to that section. She asserts, however,

that petitioner was "overtly litigious" and that he engaged in a " 'scorched-earth' approach to deplete the marital estate and to financially cripple her." We interpret this as a tacit challenge to the trial court's ruling with respect to section 508(b). Of course, petitioner counters with a comparable litany of complaints against respondent's own conduct. Ultimately, the trial court placed essentially equal fault on both sides. In this regard, the trial court found that *both* parties "chose a scorched-earth method of litigation." The court found that *both* parties fought and continue to fight over every aspect of this litigation. The court found that *both* parties lacked cooperation, communication, and insight as to their personal responsibility in "aggravating and extending this litigation." Quite simply, the record supports these findings by the trial court. Accordingly, based on our review of the proceedings, we conclude that the trial court did not abuse its discretion in denying respondent's contribution request under section 508(b).

¶ 145   Having found that the trial court did not abuse its discretion in declining respondent's contribution request pursuant to section 508(b), it is not necessary for us to address the court's ruling under section 503(j). See *Water Tower Realty Co. v. Fordham 25 E. Superior, L.L.C.*, 404 Ill. App. 3d 658, 665 (2010) (noting that an appellate court may affirm a trial court's judgment on any grounds which the record supports). Regardless, an analysis of the factors referenced in section 503(j), leads us to also conclude that the trial court's ruling that respondent was not entitled to contribution to her attorney fees from petitioner under that section did not constitute an abuse of discretion.

¶ 146   As noted, the trial court found that each party was equally litigious, uncooperative, and quarrelsome throughout the dissolution proceedings, resulting in an unnecessarily expensive divorce. See *Patel*, 2013 IL App (1st) 112571, ¶ 117; *Bradley*, 2011 IL App (4th) 110392, ¶ 32; *Haken*, 394 Ill. App. 3d at 161 (noting that a court may consider whether a party unnecessarily

increased the cost of litigation when assessing whether to award attorney fees). Moreover, while the trial court did not make specific findings with respect to the parties' abilities to pay attorney fees and costs, the court clearly considered the parties' financial circumstances given the court's detailed findings regarding the division of marital property, maintenance, and other issues. See *In re Marriage of Powers*, 252 Ill. App. 3d 506, 510 (1993) (noting that the trial court is not required to make findings as to each factor to be considered in awarding fees); *Mantei*, 222 Ill. App. 3d at 942 ("While the trial judge did not expressly state he considered the parties' financial circumstances in refusing to award attorney fees to petitioner, clearly the parties' financial circumstances were considered because the court was ruling on property distribution and maintenance as well as attorney fees"). Based on these findings, it is clear that while respondent may have arguably established an inability to pay, she failed to establish petitioner's ability to do so. While petitioner has a greater income and future earning capacity than respondent, that fact alone is not decisive. We note that the trial court assigned petitioner the "underwater" Onwentsia and Littlefield Properties. Thus, petitioner will be required to maintain the properties until they are sold and, as ordered by the trial court, he will be solely responsible for any deficiencies on the properties. With a few limited exceptions, the trial court divided the remainder of the marital assets disproportionately in respondent's favor, with respondent receiving 60% of the assets and petitioner receiving 40% of the assets. By way of example, pursuant to the calculations in respondent's brief, petitioner received $115,636.12 in "liquid assets" compared to respondent's $180,294.18. We also observe that the trial court awarded respondent maintenance and child support from petitioner. Although the amounts of these awards need to be recalculated upon remand, they are still likely to amount to several thousands of dollars per month. Further, the court ordered the parties to pay the remainder of the child-related expenses, including medical costs not

covered by insurance, on a 60/40 basis, with petitioner paying 60% of said expenses and respondent paying 40% of said expenses.

¶ 147   Moreover, we note that in his brief, petitioner asserts that given his financial obligations, he will have a negative monthly cash flow. Respondent argues that petitioner's claim that he lacks sufficient assets and income to contribute to her attorney fees should be rejected because of his lack of credibility. Interestingly, however, respondent does not argue that petitioner's math is incorrect. At least one court has held that a trial court does not abuse its discretion in denying a request for contribution to attorney fees where the opposing party's monthly cash flow is negative. See *Shen*, 2015 IL App (1st) 130733, ¶ 105 (finding that the trial court did not abuse its discretion in denying the wife's request for contribution to her attorney fees where the husband's monthly cash flow was negative).

¶ 148   In short, the trial court's decision was appropriate under section 508(b) because each party was equally litigious, uncooperative, and quarrelsome throughout the dissolution proceedings, resulting in an unnecessarily expensive divorce. Further, the trial court's decision was appropriate under sections 508(a) and 503(j) because respondent failed to establish that petitioner had the ability to pay her fees. Accordingly, we hold that the trial court did not abuse its discretion in denying respondent's request for contribution to her attorney fees from petitioner.

¶ 149                                  3. Petitioner's Argument

¶ 150   Petitioner also contends that the trial court erred in refusing to award him contribution to his legal fees from respondent. Petitioner complains that the divorce proceeding has broken him financially. He further argues that respondent is in a better position to pay his fees "[a]fter successfully wresting the majority of what was left of the marital estate away from [him]." We reject this argument for the same reasons we rejected respondent's request for contribution to her

attorney fees from petitioner. Quite simply, each party was equally litigious, uncooperative, and quarrelsome throughout the dissolution proceedings, resulting in an unnecessarily expensive divorce. And, neither party has shown the ability of the other party to contribute to the fees.

¶ 151                             III. CONCLUSION

¶ 152   For the reasons set forth above, we reverse that portion of the amended judgment of dissolution that calculated petitioner's gross income for support purposes as $362,981. We remand the matter to the trial court to recalculate petitioner's average gross income for 2014 through 2016 and to recalculate his net income and support obligations based on the corrected number. We also reverse that portion of the amended judgment of dissolution making petitioner solely responsible for the costs of the children's health insurance. We remand the matter to the trial court to allocate the cost of the health insurance premiums between the parties in proportion to their respective net incomes (750 ILCS 5/505(a)(4)(D), (E) (West 2018)). The judgment of the circuit court is affirmed in all other respects.

¶ 153   Affirmed in part and reversed in part; cause remanded with directions.